**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Walter David TALLMADGE,
Defendant-Appellant.**

No. 86–5116.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 5, 1987.

Decided Oct. 1, 1987.

Janet Hudson, Asst. U.S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Leonard R. Dubin, Los Angeles, Cal., for defendant-appellant.

Before TANG, ALARCON and KOZINSKI, Circuit Judges.

ALARCON, Circuit Judge:

Walter David Tallmadge (Tallmadge) was indicted on January 10, 1986 for knowingly receiving six rifles after being convicted in the State of California of a crime punishable by a term of imprisonment exceeding one year in violation of 18 U.S.C. § 922(h)(1) (1982), and for knowingly receiving and possessing a rifle after having been convicted of a felony in the State of California in violation of 18 U.S.C.App. § 1202(a)(1) (1982). Tallmadge was also accused, in separate counts, of making false statements likely to deceive a federally licensed gun dealer in the acquisition of each rifle in violation of 18 U.S.C. § 922(a)(6) (1982).

The facts are not in dispute. The government's entire case was submitted to the district court on stipulated facts. Tallmadge stipulated he purchased and received the rifles described in the indictment on four separate dates in 1982. Tallmade also stipulated that prior to purchasing each rifle he answered "no" to question 8.b. on the U.S. Department of the Treasury's Firearms Transaction Record, which provides as follows:

> Have you been convicted in any court of a crime punishable by imprisonment for a term exceeding one year? (Note: The actual sentence given by the judge does not matter—a "yes" answer is necessary if the judge could have given a sentence of more than one year. Also, a "yes" answer is required if a conviction has been discharged, set aside, or dismissed pursuant to an expungement or rehabilitation statute. However, a crime punishable by imprisonment for a term exceeding one year does not include a conviction which has been set aside under the Federal Youth Corrections Act.)

The stipulation also provides that Tallmadge signed the Firearms Transaction Record and certified that his answer to question 8.b. was true and correct.

In addition, Tallmadge stipulated that on October 10, 1978 he was convicted in the Superior Court for the County of Los Angeles in the State of California of the crime of illegal possession of a machinegun in violation of § 12220 of the California Penal Code, a crime punishable by a term of imprisonment exceeding one year. Cal. Penal Code § 12220 (West Supp. 1987). The stipulation further alleges that Tallmadge was told by the state trial judge on the date of sentencing, February 6, 1979, that he had been convicted of a felony. The stipulation also provides that on January 26, 1982, the state court "expunged and reduced to a misdemeanor" the 1978 conviction. The parties further stipulated that in the same state court proceeding Tallmadge was informed by the court "that the expunction order did not release him of the

obligation to disclose the prior conviction in response to a direct question or application for public office or licensure by any state or local agency."

Tallmadge and his trial attorney testified in support of the defendant's contention that as a matter of due process he could not be convicted of these federal charges because he was told by a federally licensed gun dealer that he could purchase a rifle because his state charges were reduced to a misdemeanor for all purposes. The district court found that their testimony was credible. Thus, in light of the stipulated facts, and the evidence offered by the defendant, the only issue before the trial court was the legal effect of the reduction of Tallmadge's state conviction to a misdemeanor in light of the federally licensed gun dealer's statement that he could lawfully purchase a long gun because the state trial judge had reduced the felony conviction to a misdemeanor. In order to review this narrow question, we must examine fully the facts surrounding the state court expunction proceedings and the representations made by the federally licensed gun dealer.

## I. PERTINENT FACTS

A. *Evidence Relating to the State Court Proceedings*

Tallmadge appeared for sentencing on February 6, 1979 following his conviction for possession of a machine gun. The state trial judge stayed the imposition of sentence and placed the defendant on probation for three years. At this hearing, the prosecutor made the following statement to the court in Tallmadge's presence in discussing the terms of probation:

I would like it explicitly made known to the defendant at this time as to the firearms that it refers to any kind of firearms, whether they be rifles, shotguns, handguns, ammunition, incendiary devices and explosives.

The state trial judge acquiesced. Later in the proceedings the state trial judge told Tallmadge that as a condition of his probation he could "not own, use or possess *any*

dangerous or deadly weapons." (Emphasis added).

On January 4, 1982, Tallmadge requested that the Probation Officer of Los Angeles County recommend to the state trial court that it should dismiss the pending criminal proceedings against him pursuant to Cal. Penal Code section 1203.4 (West Supp.1987) because he had complied with all the conditions of probation. The Probation Office advised the state trial court that Tallmadge had complied with all conditions of probation and was "deserving of having his offense fixed as a misdemeanor." A probation termination hearing was held on January 26, 1982 before the same state trial judge who had originally suspended proceedings in the matter three years earlier.

The prosecutor argued that probation should be terminated but objected to the reduction of the offense to a misdemeanor. The trial judge observed that because Tallmadge's conduct while on probation was "exemplary" the court would "apply the maxim 'to err is human and to forgive is divine'" and reduce the offense to a misdemeanor under Cal. Penal Code § 17 (West Supp.1987).

The state prosecutor then made the following comments:

One other thing, your Honor. May I address the Court? There is one other thing. According to the regulation in 1203.4, it says that the order of reduction shall state and the probationer shall be informed that the order does not relieve him of the obligation to disclose the conviction in response to any direct question contained in any questionnaire or application for public office or for licensure by any state or local agency.

"Dismissal of an accusation or information pursuant to this section does not permit a person to own, possess, or have in his custody or control any firearm capable of being concealed upon the person or prevent his conviction under Section 12021."

The trial judge then asked Tallmadge if he understood. Tallmadge replied, "Yes, sir." Thereafter, the state trial judge signed an order reducing the offense to a

misdemeanor pursuant to Cal. Penal Code § 17 and terminating probation pursuant to Cal. Penal Code § 1203.4. In addition, the state trial court ordered that Tallmadge's conviction be set aside, that a plea of not guilty be entered, and that case was dismissed pursuant to Cal. Penal Code § 1203.4.

It is clear from the reporter's transcript of these state court proceedings that Tallmadge was ordered by the court not to carry *any* firearm while on probation. The record also discloses that three years later Tallmadge was told by the court, at the suggestion of the prosecutor, that he could not carry a *concealable* firearm under California law, notwithstanding the termination of his probation and the dismissal of the state charges. No statement was made to the defendant concerning his right to carry a nonconcealable weapon under federal law. It is also noteworthy that the state trial judge did not explain to Tallmadge the legal effect of the reduction of the charge of possession of a machine gun to a misdemeanor "for all purposes" under Cal. Penal Code § 17(b)(3).

After his probation was terminated, Tallmadge's attorney told him there was no problem owning a nonconcealable gun.

## B. Evidence Relating to the Due Process Defense

At the commencement of the bench trial before the district court, the trial judge advised counsel that he read the stipulated facts and the attached exhibits containing the relevant proceedings before the state trial judge regarding Tallmadge's conviction for illegal possession of a machine gun under California law. The district court then inquired of defense counsel, Charles Weedman, "What is your defense?" Mr. Weedman advised the court that his client would testify

that he believed that when the felony— the underlying felony was reduced to a misdemeanor that thereafter the judge could no longer impose a sentence greater than one year, and, therefore, for him to purchase at least a long gun would be permissible under federal law.

The trial judge then inquired, "You are satisfied that his state of mind as you described it would be a defense, is that what you are saying."

Mr. Weedman replied as follows:

Well, I am seeking to offer that evidence for whatever constitutional attack may be appropriate in this case.

I think that the form [Firearms Transaction Record] is misleading. I think it is constitutionally defective in that respect. Ignorance of the law is no excuse, and such testimony offered for that purpose, I imagine your Honor would not permit. But I think his reading of it in that fashion at least lays the foundation for a constitutional due process attack.

The district court then requested the government to state its position. The prosecutor replied that Tallmadge's state of mind was not a defense.

After the foregoing colloquy concerning Mr. Weedman's offer of proof, the government rested without calling any witnesses, relying on the facts set forth in the stipulation.

Tallmadge then testified that prior to purchasing any of the firearms described in the indictment he had a conversation with Lewis Ferguson. Ferguson was the president of Cole's Manchester Arms (Cole's). The firearms referred to in the indictment were purchased at Cole's. The records of the Bureau of Alcohol, Tobacco & Firearms (hereinafter ATF) show that at all relevant times in this matter Cole's was a federally licensed dealer in firearms. Ferguson signed each application for Cole's license to engage in business as a firearms dealer. Tallmadge testified that "Mr. Ferguson said he had read and understood that I was in some kind of problem, and there may have been a felony conviction. And I said that was changed to a misdemeanor conviction, and there was no problem."

Tallmadge testified that Ferguson agreed that there was no problem owning a gun because the felony conviction had been reduced to a misdemeanor.

Following Tallmadge's testimony, the district court suggested that Mr. Weedman

testify. Mr. Weedman agreed to do so after Tallmadge waived his attorney-client privilege. The district court conducted the direct examination of Mr. Weedman.

Mr. Weedman testified that he advised his client that he could not purchase a firearm during the period of probation because "he stood convicted of a felony." Mr. Weedman also testified that while the machine gun possession charge "was a state proceeding it was largely orchestrated by agents of the ATF." ATF agents also testified at the trial of the machinegun possession charges.

Mr. Weedman testified that it is his view of the applicable California statutes that upon the reduction of a felony conviction to a misdemeanor it was no longer a felony conviction.

During Mr. Weedman's testimony, the district court asked the government to comment on whether question 8.b. on the Firearms Transaction Record addresses the effect of the reduction of a felony to a misdemeanor. The government replied that Tallmadge was required to answer question 8.b. in the affirmative because Cal.Penal Code § 1203.4 requires a person whose felony record is expunged to disclose his prior felony conviction in any application for licensure. The government again argued to the court that state of mind is not a defense to the receipt and possession charges. The court was told:

> [T]he government's position would be that the defendant's belief that it was not a felony is irrelevant to the possession and receipt charges. He is guilty despite state of mind of possessing a gun as a prior felon and of receiving guns as a prior felon.

After this exchange, Mr. Weedman testified that he advised Tallmadge following the probation termination proceedings that he could legally possess "long guns" but not concealable weapons because the charge of possession of a machine gun had been reduced to a misdemeanor.

The district court found Tallmadge not guilty of each count charging him with making false statements concerning his prior conviction. The court concluded that "there wasn't a requisite specific intent as regards 922(a)(6)." Tallmadge was found guilty of each count charging him with receipt and possession of a firearm, however, because the court concluded that his "subjective belief" that he had not been convicted of a felony or a crime punishable by imprisonment for more than one year was not relevant because these crimes are complete upon proof of knowing receipt or possession of a firearm.

During the sentencing hearing, the district court commented that the advice given to Tallmadge by his experienced criminal lawyer after his conviction was reduced to a misdemeanor could "disarm him." It further noted that this fact, coupled with his "open and notorious purchase of weapons from a dealer that he knew in Santa Monica," was "all consistent with a mens rea to the effect, look at, I am not doing anything wrong." In explaining its conclusion that Tallmadge's state of mind was not a defense to the charges of receipt or possession of firearms, the district court did not discuss the import of the evidence concerning the federally licensed gun dealer's statement to Tallmadge that it would not be a "problem" to receive or possess weapons after a state trial judge has reduced a felony conviction to a misdemeanor.

## II. DISCUSSION

A. *Applicability of the Federal Statutes to Persons Whose State Felony Conviction Have Been Reduced To a Misdemeanor*

Tallmadge claims that the federal statutes prohibiting (1) wrongful receipt of a firearm by a person who has been convicted of a crime punishable by a term of imprisonment exceeding one year under 18 U.S.C. § 922(h)(1) and (2) possession of a firearm by a person who has been convicted of a felony under 18 U.S.C.App. § 1202(a)(1), do not apply to him because his prior conviction for possession of a machinegun in violation of Cal.Penal Code § 12220, was reduced to a misdemeanor *for all purposes* after he successfully completed his probationary term.

Section 922(h)(1) applies to anyone "under indictment for, or ... convicted ... of a crime punishable by imprisonment for a term exceeding one year...." 18 U.S.C. § 922(h)(1). Possession of a machine gun under California law is punishable by "imprisonment in the state prison, or by a fine not to exceed ten thousand dollars ($10,-000), or by both such fine and imprisonment." Cal.Penal Code § 12220 (West Supp.1987). In order to avoid a felony conviction, Tallmadge requested at the time of sentencing before the state court trial judge that the court impose a sentence of one year in the county jail, and then suspend the imposition of sentence. That request was denied. Instead, the state judge suspended the imposition of sentence and placed Tallmadge on probation for a period of three years.

■ Tallmadge argues that the reduction of the crime to a misdemeanor upon the successful completion of the term of probation precludes prosecution under section 922(h). Under California law a felony is defined as "a crime which is punishable with death or by imprisonment in the state prison." Cal.Penal Code § 17(a). We rejected a similar contention in *United States v. Pruner*, 606 F.2d 871 (9th Cir.1979). In *Pruner*, the defendant was also charged with a violation of 18 U.S.C. § 922(h)(1). *Id.* at 872. The indictment alleged that he had been convicted in California of receiving stolen property, a crime punishable by imprisonment for a term exceeding one year. *Id.* In 1968 California law provided that the punishment for receiving stolen property was "imprisonment in a state prison for not more than 10 years, or in a county jail for not more than one year." Cal.Penal Code § 496.1. The state trial judge sentenced Pruner to 60 days in the county jail, placed him on probation for three years, and fined him $250. *Id.* at 872. Under California law the crime became a misdemeanor on the basis of the sentence imposed. *Id.*

Pruner argued before this court that at the time he purchased the firearms, after the imposition of sentence in the state court, his crime was not punishable by imprisonment for one year. *Pruner*, 606 F.2d at 872–73. We held in *Pruner* that in applying section 922(h)(1), " 'we look to state law solely to determine whether the maximum permissible prison term exceeds one year.' " *Id.* at 873 (quoting *United States v. Houston*, 547 F.2d 104, 106 (9th Cir.1976)). Thus, the maximum permissible punishment in California for possession of a machinegun is clearly covered by the language of 18 U.S.C. § 922(h)(1). Cal.Penal Code § 12220.

Tallmadge asserts that the reduction of the state charge of possession of a machinegun precludes his conviction for a violation of section 1202. Section 1202 applies to any person who "has been convicted ... of a felony...." 18 U.S.C.App. § 1202(a)(1). Section 1202(c)(2) defines a "felony" as "any offense punishable by imprisonment for a term exceeding one year, but does not include any offense (other than one involving a firearm or explosive) classified as a misdemeanor...." *Id.* § 1202(c)(2).

■ Although the definition contains an exception for offenses classified as misdemeanors by a state, the exception is inapplicable to the instant matter because Tallmadge's predicate conviction involved a firearm. Offenses involving a firearm are expressly excluded from the misdemeanor exception. *Id.; Houston*, 547 F.2d at 106 (construing section 1202); *see also Dickerson v. New Banner Inst., Inc.*, 460 U.S. 103, 113–14, 103 S.Ct. 986, 992, 74 L.Ed.2d 845 (1983).

Tallmadge also argues that the statutes under which he was convicted are void for vagueness because they fail to give sufficient notice to potential violators. In addition, he claims that the district court erred in concluding that proof of intent was not required under section 922(b) and section 1202. We summarily rejected the vagueness argument as to section 1202 in *Houston*. 547 F.2d at 107. In *Pruner* we held that section 922(h) was a regulatory measure that did not require scienter. 606 F.2d at 873–74. As the language in the two sections is nearly identical, these holdings apply equally to both.

## B. *Entrapment by Estoppel*

Although the district court expressly found that Tallmadge believed that he could receive and possess rifles without violating federal law because of the reduction of his state conviction to a misdemeanor for all purposes, it rejected his state of mind-due process defense on the ground that scienter is not a defense to those offenses. In reaching this conclusion, the district court did not consider the applicability of the due process defense of entrapment by estoppel. In fairness, it should be noted that while defense counsel advised the court that his defense to the charges was based on due process grounds, he failed to cite any authority concerning the constitutional consequences of official misleading. The issue of entrapment by estoppel was not before us in *Pruner* or *Houston*.

In *United States v. Hsieh Hui Mei Chen,* 754 F.2d 817 (9th Cir.), *cert. denied,* 471 U.S. 1139, 105 S.Ct. 2684, 86 L.Ed.2d 701 (1985), we described the defense of entrapment by estoppel as follows: "Entrapment by estoppel applies when an official tells the defendant that certain conduct is legal and the defendant believes the official." *Id.* at 825 (citing *Cox v. Louisiana,* 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965)). In *Hsieh Hui Mei Chen,* one appellant contended that the trial court erred in failing to instruct the jury on the defense of entrapment by estoppel. 754 F.2d at 825. We affirmed because the evidence showed the official "told [the defendant] ... that the conduct was illegal, and [the defendant] ... stated that she knew her actions were unlawful." *Id.*

The concept of unintentional entrapment by an official who mistakenly misleads a person into a violation of the law was first applied by the Supreme Court in *Raley v. Ohio,* 360 U.S. 423, 79 S.Ct. 1257, 3 L.Ed.2d 1344 (1959). In *Raley,* the appellants were convicted of contempt for refusing to answer questions about Communist or subversive activities at sessions of the Unamerican Activities Commission of the State of Ohio. *Id.* at 424, 79 S.Ct. at 1259. The appellants had claimed their privilege against self-incrimination after they were informed by the Commission Chairman that they had a right to do so under article I, section 10 of the Ohio Constitution. *Id.* at 425, 79 S.Ct. at 1259. The Commission's advice was contrary to Ohio law. *Id.* at 438–39, 79 S.Ct. at 1266–67. An Ohio immunity statute deprived them of the protection of the privilege against self-incrimination. *Id.* The Supreme Court reversed the convictions. The Court expressed its holding in the following language:

> We hold that in the circumstances of these cases, the judgments of the Ohio Supreme Court affirming the convictions violated the Due Process Clause of the Fourteenth Amendment and must be reversed, except as to one conviction, as to which we are equally divided. After the Commission, speaking for the State, acted as it did, to sustain the Ohio Supreme Court's judgment would be to sanction an indefensible sort of entrapment by the State—convicting a citizen for exercising a privilege which the State had clearly told him was available to him.

*Raley,* 360 U.S. at 425–26, 79 S.Ct. at 1260.

In *Cox v. Louisiana,* 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965), the Supreme Court applied *Raley* in reversing the conviction of persons who were arrested for picketing across the street from a courthouse. *Id.* at 571, 85 S.Ct. at 484. The defendants were given permission to hold their demonstration on the west side of the street by the Chief of Police. *Id.* at 569–70, 85 S.Ct. at 483. Some time thereafter the demonstrators were ordered to disperse by the Sheriff. *Id.* at 570, 85 S.Ct. at 483. They were arrested for refusing to obey the dispersal order. The court concluded that at the time of his arrest, Cox was "justified in his continued belief that because of the original grant of permission he had a right to stay where he was for the few additional minutes required to conclude the meeting." *Id.* at 572, 85 S.Ct. at 485. The Court in *Raley* held that "[t]he Due Process Clause does not permit convictions to be obtained under such circumstances." *Id.* at 571, 85 S.Ct. at 484.

More recently, in *United States v. Pennsylvania Indus. Chem. Corp.*, 411 U.S. 655, 93 S.Ct. 1804, 36 L.Ed.2d 567 (1973), the Supreme Court, relying on *Raley* and *Cox*, held that it was error to deny a corporate defendant the right to present evidence that it had been affirmatively misled by the responsible administrative agency into believing that the law did not apply in this situation. *Id.* at 670–75, 93 S.Ct. at 1814–17.

In 1972, we applied the defense of official misleading to the conduct of a local draft board in *United States v. Timmins*, 464 F.2d 385, 386–87 (9th Cir.1972). We held in *Timmins* that the defendant must show that he relied on the false information and that his reliance was reasonable. *Id.* at 387; see also *United States v. Lansing*, 424 F.2d 225, 227 (9th Cir.1970) (to establish the defense of official misleading, the defendant must establish "that his reliance on the misleading information was reasonable—in the sense that a person sincerely desirous of obeying the law would have accepted the information as true, and would not have been put on notice to make further inquiries").

In the matter before us, the uncontradicted evidence established that Tallmadge received and possessed firearms in reliance upon the representation of a federally licensed gun dealer that a person convicted of a felony in a state court could purchase firearms if the offense had subsequently been reduced to a misdemeanor. We have no doubt that under the doctrine of entrapment by estoppel a person could not be prosecuted under 18 U.S.C. §§ 922(h)(1) and 1202(a)(1) if an ATF official had represented that a person convicted of a felony can purchase firearms after the charge has been reduced to a misdemeanor. Here, the misleading statement regarding the lawfulness of Tallmadge's proposed conduct was made by a licensee of the federal government. We noted in *Pruner* that Congress has placed a duty on firearms dealers to question their customers regarding a possible criminal record. 606 F.2d at 874. A licensed dealer may not sell a firearm to any person if he knows or has reasonable cause to believe that such person "is under indictment for, or has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year...." 18 U.S.C. § 922(d)(1) (1982).

The Department of the Treasury requires a licensed firearms dealer and a prospective buyer to fill out a form entitled Firearms Transaction Record to permit the licensee to determine if he may lawfully sell a firearm to such person. The form also requires the firearms dealer "to alert the transferee [buyer] of certain restrictions on the receipt and possession of arms." The form further provides that "[t]he transferor [seller] of the firearm is responsible for determining the lawfulness of the transaction...." To fulfill this duty the form provides that the firearms dealer "should be familiar with the Gun Control Act of 1968 (18 U.S.C. Chapter 44) and Title VII, Unlawful Possession or Receipt of Firearms, (82 Stat. 197), and 27 CFR Part 178 (Commerce in Firearms and Ammunition)."

Thus, Congress has not only granted certain persons the exclusive right to engage in the business of selling firearms, it has also given them the affirmative duty of inquiring of a prospective buyer whether he has a criminal record that would make it unlawful for him to purchase a firearm. 18 U.S.C. § 922(d)(1). In addition, the Treasury Department requires licensees to inform buyers concerning the restrictions imposed by Congress on the purchase of firearms. Clearly, the United States Government has made licensed firearms dealers federal agents in connection with the gathering and dispensing of information on the purchase of firearms. Under these circumstances, we believe that a buyer has the right to rely on the representations of a licensed firearms dealer, who has been made aware of all the relevant historical facts, that a person may receive and possess a weapon if his felony conviction has been reduced to a misdemeanor. *See Sherman v. United States*, 356 U.S. 369, 373–75, 78 S.Ct. 819, 821–22, 2 L.Ed.2d 848 (1958) (entrapment activities of an unpaid

informer cannot be disowned by the government).[1]

■ Tallmadge did not rely solely on the misleading representations of the licensed firearms dealer. He also sought and obtained advice from an experienced criminal lawyer regarding his right to possess a nonconcealable firearm in light of the state trial judge's admonition against possessing a *concealable* weapon. He was told by his attorney that he could possess a "long gun." The uncontradicted evidence establishes that Tallmadge's reliance on the firearm dealer's misleading information was reasonable in light of his attorney's legal opinion that he could purchase a rifle, and the comments of the state trial judge and the deputy district attorney at the probation termination proceedings. The prosecution and conviction of Tallmadge for the receipt and possession of firearms, after he was misled by the government agent who sold him the weapons into believing that his conduct would not be contrary to federal law, violated due process.

REVERSED.

1. The dissent has relied upon the Tenth Circuit's decision in *United States v. Browning,* 630 F.2d 694 (10th Cir.1980), *cert. denied,* 451 U.S. 988, 101 S.Ct. 2324, 68 L.Ed.2d 846 (1981) in support of the conclusion that an erroneous interpretation of the law by a government agent is not binding on the government. Dissent at 7. The language from the *Browning* decision quoted by the dissent is dictum. Furthermore, *Browning* is factually dissimilar. In the instant matter, it is undisputed that Tallmadge was misled. In *Browning,* the Tenth Circuit stated that the appellant "was not shown to have been misled or to have acted on the basis of having been misled." 630 F.2d at 702. The defense of entrapment by estoppel is inapplicable if the defendant is not misled. The Tenth Circuit also noted that Browning was guilty of "deliberate violation of one statute in order to escape liability under another statute." *Id.* at 704. There is nothing in the record in the instant matter that would support a finding of deliberate violation of the law. Instead the district court expressly found that Tallmadge did not believe he was violating the law.

The dissent also cites *United States v. Smith,* 802 F.2d 1119 (9th Cir.1986) and *Hsieh Hui Mei Chen,* 754 F.2d 817, for the proposition that entrapment *by estoppel* requires proof of trickery, persuasion, or fraud of a government agent. Dissent at 8. None of the cases from the Su-

preme Court or this circuit that have applied the defense of entrapment *by estoppel* have required a showing of fraud or intentional deception. In *Smith* we stated:

> To establish entrapment as a matter of law, the defendant must point to undisputed evidence making it patently clear that an otherwise innocent person was induced to commit the illegal act by trickery, persuasion, or fraud of a government agent.

802 F.2d at 1124 (citing *Hsieh Hui Mei Chen,* 754 F.2d at 821). Our decision in *Smith* was limited to the requirements of fraudulent or intentional entrapment. We did not discuss the defense of entrapment *by estoppel* in *Smith.*

In *Hsieh Hui Mei Chen,* we distinguished between intentional entrapment and entrapment *by estoppel.* We stated that entrapment is proved as a matter of law when there is evidence of "trickery, persuasion, or fraud of a government agent." 754 F.2d at 821. Later in discussing entrapment *by estoppel,* we said that this defense is established "when an official tells the defendant that certain conduct is legal and the defendant believes the official." *Id.* at 825. Thus, under *Hsieh Hui Mei Chen,* a person who has been misled by the statements of a government agent into the belief that certain conduct is lawful may not be convicted of committing that act, notwithstanding the fact that the government agent did *not* intend to deceive or entrap the defendant.

KOZINSKI, Circuit Judge, dissenting.

In reversing the conviction of a defendant who may have stumbled into criminal activity inadvertently, the court today reaches a just result. But it does so at too high a price, for this is a case where "justice to the individual is rightly outweighed by the larger interests on the other side of the scales." O.W. Holmes, *The Common Law* 48 (1881).

**Introduction**

In 1978, Tallmadge was convicted in California Superior Court of a felony: possession of a machine gun in violation of California law. The conviction carried a potential penalty in excess of one year. Cal.Penal Code § 12220 (Deering Supp.1987); *id.* § 18 (Deering 1985). In 1982, the California Superior Court issued an order under California Penal Code section 17(b)(3) declaring the offense a misdemeanor "for all purposes." Later that year, Tallmadge purchased four rifles on four separate occasions. As a consequence, he was indicted and convicted of four counts of unlawful

receipt of firearms, 18 U.S.C. § 922(h)(1) (1982), and one count of unlawful possession, 18 U.S.C. app. § 1202(a)(1) (1982 & Supp. III 1986).

Tallmadge contends that these statutes do not apply to him because his state conviction was reduced to a misdemeanor. But section 922(h) applies to anyone "convicted in any court of ... a crime punishable by imprisonment for a term exceeding one year," while section 1202 applies to any person "convicted ... of a felony," defined as "any offense punishable by imprisonment for a term exceeding one year." 18 U.S.C. § 1202(a)(1), (c)(2). Because Tallmadge was convicted of an offense punishable by imprisonment for more than one year, the federal statutes clearly apply. *United States v. Pruner,* 606 F.2d 871, 873 (9th Cir.1979); *United States v. Bergeman,* 592 F.2d 533, 537 (9th Cir.1979); *United States v. Houston,* 547 F.2d 104, 106 (9th Cir.1976). Tallmadge also contends that the statutes are so vague as to violate due process and that scienter should be a required element of those crimes. These arguments are likewise foreclosed in this circuit. *Pruner,* 606 F.2d at 874; *Houston,* 547 F.2d at 107.

Even appellant recognizes that "all of the issues presented on Appeal appear to have already been carefully considered by this circuit and others"; nonetheless, he urges us to reconsider those decisions. Appellant's Brief at 9. The majority quite rightly rejects this invitation since only an en banc panel may reconsider circuit precedent. Nevertheless, the majority reverses Tallmadge's conviction, creating a new criminal defense on its own motion, without the benefit of argument by the parties or an appropriate factual record. The words "entrapment" or "estoppel" do not find their way into any of the briefs or transcripts below; not a single one of the cases on which the majority relies with respect to this issue is cited by either party.

The majority's reliance on the doctrine of entrapment by estoppel is misguided and could have very serious consequences, unsettling many important and heretofore unquestioned legal principles. I have four major concerns. *First,* I believe the panel errs in allowing Tallmadge to rely on statements purportedly made by the gun dealer, who is not even a federal employee, much less an official authorized to bind the government. *Second,* important practical and policy considerations counsel against applying the entrapment defense to this type of situation. *Third,* the record simply does not support estoppel. *Finally,* the estoppel defense is entirely inapposite where the crime does not require scienter.

## Discussion

### I.

The estoppel defense has heretofore been construed very narrowly because it "permit[s] the individual official to alter or suspend the statutory penal law simply by misinterpreting it." Note, *Applying Estoppel Principles in Criminal Cases,* 78 Yale L.J. 1046, 1052 (1969). To qualify, the defense must establish very clearly three elements: (1) that the official involved was authorized to enforce or interpret the statute; (2) that the official's statements affirmatively misled the defendant; and (3) that the defendant reasonably relied on them. *See* Model Penal Code § 2.04(3)(b)(iv) (1985).[1] Although Tallmadge would have difficulty establishing any of these elements, my principal con-

---

1. The Model Penal Code provides:
   (3) A belief that conduct does not legally constitute an offense is a defense to a prosecution for that offense based upon such conduct when:

   .    .    .    .    .

   (b) [a defendant] acts in reasonable reliance upon an official statement of the law, afterward determined to be invalid or erroneous, contained in ... (iv) an *official interpretation of the public officer or body charged by law with responsibility for the interpretation,*

*administration or enforcement of the law* defining the offense.
   (4) The defendant must prove a defense arising under Subsection (3) of this Section by a preponderance of evidence.
Model Penal Code § 2.04 (1985) (emphasis added). The comments emphasize that this defense is "a limited exception to the principle ... that culpability is not generally required as to the illegality of the actor's conduct." *Id.,* explanatory note at 268.

cern is with the majority's apparent willingness to allow individuals with only the most tenuous relationship to the government to bind it with respect to the interpretation and enforcement of the criminal laws.

A. "The case law on mistake of law supports the proposition that the reliance on an official misinterpretation of the law defense may be invoked only when the official relied on is the appropriate official—the one authorized to render the particular advice or opinion later found to be erroneous." Note, *United States v. Barker: Misapplication of the Reliance on an Official Interpretation of the Law Defense*, 66 Calif.L.Rev. 809, 825–26 (1978) [hereinafter *Official Interpretation*]. Thus, in *Raley v. Ohio*, 360 U.S. 423, 79 S.Ct. 1257, 3 L.Ed.2d 1344 (1959), defendants relied on assurances by the chairman of a state legislative commission that they were entitled to assert the privilege against self-incrimination. Despite the clear implication that defendants would not be subject to contempt for asserting the privilege, they were charged with contempt and convicted. The Supreme Court reversed. Its ruling, however, was a very narrow one, emphasizing that the advising official "clearly appeared to be the agent of the State in a position to give such assurances." *Id.* at 437, 79 S.Ct. at 1266. Likewise, in *Cox v. Louisiana*, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965), defendant was misled by "the highest police officials of the city," including the chief of police. *Id.* at 571, 85 S.Ct. at 484. Similarly, in *United States v. Pennsylvania Indus. Chem. Corp.*, 411 U.S. 655, 93 S.Ct. 1804, 36 L.Ed.2d 567 (1973), the defendant argued that longstanding regulations of the agency responsible for enforcing the statute denied it fair warning of what conduct the government intended to treat as criminal.[2]

Here, the statements on which the majority relies as the basis of the estoppel were uttered by someone who is not even a federal employee, much less an official authorized to speak for the government. This seems to run squarely contrary to the principle that minor federal officials may not bind the government to erroneous interpretations of the law. For example, in *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947), the Court held that Wheat Crop Insurance Regulations were binding on farmers who claimed they were misled by the representations of the County Agricultural Conservation Committee. The committee had misinterpreted the applicable regulations and told the farmers that their reseeded crop was insurable. The regulations, the Court held, were binding regardless of what the farmers may have been told or the "hardship resulting from innocent ignorance." *Id.* at 383–85, 68 S.Ct. at 2–3.

Almost four decades later, in *Heckler v. Community Health Servs.*, 467 U.S. 51, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984), the Court reaffirmed the vitality of *Merrill*. In *Community Health Services*, defendant CHS received CETA payments through an intermediary, Travelers Insurance Company. Travelers gave CHS an erroneous interpretation of a certain reimbursement rule and, as a result, CHS received approximately $71,000 in overpayments from the government. The Third Circuit held that the government was estopped from demanding repayment because of the "affirmative misconduct" of its agent Travelers. The Supreme Court reversed. Although the majority left open the possibility that estoppel could apply in certain circumstances, the Court reaffirmed the narrow *Merrill* standard for when an agent may bind the government. As a general rule, the Court noted, "those who deal with the Government are expected to know the law and may not rely on the conduct of Government agents contrary to law." *Id.* at 63, 104 S.Ct. at 2225.

This principle was applied in a criminal context closely resembling our case in *United States v. Browning*, 630 F.2d 694

---

**2.** Commentators almost universally agree that the authority of the official is of crucial importance to the estoppel defense. *Official Interpretation*, 66 Calif.L.Rev. at 828; *see* W. LaFave &

A. Scott, *Substantive Criminal Law* § 5.1, at 594 (1986); R. Perkins & R. Boyce, *Criminal Law* 1042 (3d ed. 1982); Hall, *Ignorance and Mistake in Criminal Law*, 33 Ind.L.J. 1, 24 (1957).

(10th Cir.1980), *cert. denied,* 451 U.S. 988, 101 S.Ct. 2324, 68 L.Ed.2d 846 (1981). Browning, the former president of an arms company, was convicted of attempting to obstruct the administration of the customs laws. He claimed estoppel on the ground that he had been misled by an official of the U.S. Customs Service. The Tenth Circuit noted that the doctrine of estoppel is applied against the government with "great reluctance":

It is fundamental that the United States is not estopped by representations made by an agent without authority to bind the government in a transaction....

... [O]ne who relies on a legal interpretation by a governmental official assumes the risk that it is in error.... It has also been held or said that "the government could scarcely function if it were bound by its employees' unauthorized representations." *Goldberg v. Weinberger,* 546 F.2d 477, 480 (2nd Cir. 1976), *cert. denied,* 431 U.S. 937, 97 S.Ct. 2648, 53 L.Ed.2d 255 (1977).

....

In the case at bar, at least one government agent, Regan [a Customs official], did misinform Browning regarding the requirements to be complied with when filling out the Customs forms. The statements made by Regan were incorrect. Under the settled law, however, incorrect statements made by a government official may not serve as a basis for holding the government estopped from enforcing its regulations even if the misinformation had led to Browning's subsequent conduct.

*Id.* at 702–03. The defendant's conviction was upheld.

Tallmadge's estoppel claim is far weaker than Browning's. Browning was misled by someone who at least was employed by the government, an officer of the very agency charged with administering the applicable laws. Here the statements are attributed to a private party whose only connection to the government is his federal license to sell firearms. It is wholly unprecedented to bind the government to interpretations of the law by someone so tenuously related to

it. *Community Health Services,* involving a private entity administering a federal program, would seem to preclude this result.

B. Not only did the gun dealer lack authority to bind the government, his representations do not amount to the "affirmative misconduct" required to invoke estoppel against the government. The estoppel defense requires conduct resembling entrapment—some affirmative act by an official that misleads the defendant. *See Santiago v. INS,* 526 F.2d 488, 491–92 (9th Cir.1975), *cert. denied,* 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976). This is something more than "a mere failure to inform or assist." *Lavin v. Marsh,* 644 F.2d 1378, 1384 (9th Cir.1981); *see also Raley,* 360 U.S. at 438, 79 S.Ct. at 1266 (noting "active misleading").

Nothing the gun dealer is alleged to have said even remotely resembles entrapment, at least as that term has heretofore been interpreted. *See, e.g., United States v. Smith,* 802 F.2d 1119, 1124 (9th Cir.1986) ("[t]o establish entrapment as a matter of law, the defendant must point to undisputed evidence making it patently clear that an otherwise innocent person was induced to commit the illegal act by trickery, persuasion, or fraud of a government agent"); *United States v. Hsieh Hui Mei Chen,* 754 F.2d 817, 821 (9th Cir.), *cert. denied,* 471 U.S. 1139, 105 S.Ct. 2684, 86 L.Ed.2d 701 (1985). The majority's contrary conclusion could reasonably be interpreted as relaxing the standard for entrapment.

C. Moreover, regardless of what the gun dealer may have said, I would find Tallmadge's reliance on such advice inherently unreasonable. A gun dealer is not a government official; he is a private individual whose economic interest lies in consummating the transaction, not scotching it. Had Tallmadge wanted an authoritative interpretation of the applicable law, he could well have written to the Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, whose name and address is inscribed on the Firearms Transaction Record he was required to fill out. Or, he might have inquired of his local office of

the United States Attorney as to its enforcement policy in this area. Had he received erroneous information from responsible officials in those agencies, he might well have been entitled to claim estoppel. Instead, however, Tallmadge chose the weakest link in the enforcement chain, gave a vague description of his situation and received an off-the-cuff response, which just happened to be what he wanted to hear. *See* pp. 780–81 *infra.*

Holding that Tallmadge's reliance on this advice was reasonable does much to undermine the orderly enforcement of the criminal laws. In words that have lost none of their vitality with the passage of time, Oliver Wendell Holmes noted over a century ago: "It is no doubt true that there are many cases in which the criminal could not have known that he was breaking the law, but to admit the excuse at all would be to encourage ignorance where the law-maker has determined to make men know and obey...." *The Common Law* at 48. Allowing Tallmadge to rely on the gun dealer's half-hearted acquiescence indeed thwarts the law-maker's determination "to make men know and obey."

### II.

Strong policies also militate against the majority's expansion of the estoppel defense. Authorizing gun dealers to legitimize otherwise illegal gun transactions will create an administrative nightmare. If gun dealers, and possibly other government licensees, can bind the United States as to the legal and factual issues underlying the difficult question of whether an applicant is entitled to buy or own a gun, they must become investigators, fact-finders and legal experts to boot. The problems this would raise are countless, but here are a few:

How can the gun dealer be sure he is interpreting the law correctly? Most gun dealers are scarcely equipped to make legal determinations. Will they be obliged to get an opinion from a lawyer or the Bureau of Alcohol, Tobacco and Firearms before each sale?

A dealer may make hundreds, perhaps thousands, of sales. The legality of any one of those transactions may be litigated years after the event. The gun dealer may have gone out of business or sold the store to someone else or died; or the transaction may have been consummated by a former employee; or, most likely of all, no one will remember just what happened. The government will seldom if ever be able to contradict a defendant's self-serving account of who said what to whom. I can imagine that every illegal purchase will suddenly have been "approved" by the dealer.

How does one deal with a convict determined to buy a gun? For example, if Tallmadge had been turned down by the first dealer, what would have prevented him from going to another dealer and yet another until he found one gullible enough to tell him what he wanted to hear? Indeed, ineligible buyers might be able to launder their purchases by finding unscrupulous dealers willing to give the "right" answer to the "right" question.

The idea that the holder of a government license can estop the government's enforcement of its penal laws has explosive potential.[3] The majority's rationale is not limited to gun dealers; holders of many other government licenses could fit neatly into the opinion's rationale. For example, liquor store clerks are prohibited by law from selling alcohol to those under the age of 21. If a clerk forgets to check, or makes a mistake, does that exonerate a minor who buys liquor illegally? Will the illegal use of food stamps be excused because the grocery store clerk mistakenly allows the purchase? There are countless other private parties who hold licenses from the federal, state and local governments. In most cases, the law requires licensees to make reasonably sure that the

---

**3.** The majority's theory runs against the grain of decisions standing for the proposition that the holder of a government license does not act under color of state law for purposes of the equal protection clause. *See, e.g., Moose Lodge, Inc. v. Irvis,* 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972); *Dezell v. Day Island Yacht Club,* 796 F.2d 324 (9th Cir.1986).

transaction is legal. But before today no one assumed that they could issue "Get Out of Jail Free" cards. Licensees can certainly help prevent many illegal transactions, but they ought not be given the power to suspend or alter the law.[4]

### III.

In any event, the record provides scant factual basis for an estoppel defense. The following testimony is the only evidence I have been able to find on this point:

A [TALLMADGE]: Mr. Ferguson [the gun dealer] said that he had read and understood that I was in some kind of a problem, and there may have been a felony conviction.

And *I said* that was changed to a misdemeanor conviction, and *there was no problem.*

. . . .

A: He said—he said that it was—if it was a misdemeanor, then there is no problem.

I explained that it was—the judge made it a misdemeanor conviction, and that was it.

. . . .

Q: Well, Mr. Tallmadge, did Mr. Ferguson understand that you had been convicted of a felony before it was reduced to a misdemeanor?

That is asking you for what was in his mind.

A. Yes.

. . . .

A: ... *I can't remember exactly what we said,* but it was his understanding that it could have been a felony, and he asked about it. And *I said* the judge made it a misdemeanor, so, therefore,

*there was no problem.* He agreed and sold me the gun with no question.

R.T., March 11, 1986, at 10–12 (emphasis added).

This testimony—even if taken at face value as it came from defendant's own mouth—does not portray Tallmadge as earnestly seeking advice as to the legality of the transaction. Instead, it shows that Ferguson, the gun dealer, expressed doubts about whether Tallmadge could buy a gun and Tallmadge convinced the dealer to sell him one anyway because everything was "all right." Indeed, had the gun dealer not taken the initiative of asking Tallmadge whether he had been convicted of a felony, the issue would never have come up. Tallmadge certainly did everything he could to conceal the relevant facts. While he was well aware that he had been convicted of a crime punishable by imprisonment for over a year, on four separate occasions he answered "No" to Question 8(b) on the Firearms Transaction Record (FTR). This question asked if he had ever been convicted of such a crime and specifically warned that a "yes" answer was required even if "a conviction has been discharged, set aside, or dismissed pursuant to an expungement or rehabilitation statute." We have no idea what the gun dealer knew beyond this false statement in the FTR and Tallmadge's assurance that "there was no problem" because "the judge made it a misdemeanor."[5]

Moreover, even if Tallmadge's account of the conversation with the gun dealer were legally sufficient, the district judge need not have believed it all. Tallmadge's testimony is equivocal as to what he told the dealer about his conviction, admitting that

---

**4.** Attorneys hold licenses from the state authorizing them to interpret the law. Yet they do not thereby become agents of the government, capable of binding it to erroneous advice. We have consistently held that criminals cannot claim reliance on the faulty advice of private counsel. Indeed, we specifically rejected this defense to a conviction under section 1202(a)(1). *United States v. Locke,* 542 F.2d 800, 801 (9th Cir.1976); *see also United States v. Hayes,* 535 F.2d 479, 481 (8th Cir.1976). I am therefore particularly troubled by the majority's reliance on the allegedly misleading advice of

Tallmadge's lawyer. Majority opinion at 775.

**5.** Actually, what Tallmadge said about whether his conviction was a felony or a misdemeanor has no relevance to the legality of the purchase. The only information relevant under federal law was whether the offense was punishable by imprisonment for more than a year. 18 U.S.C. §§ 922(h), 1202(c)(2). The gun dealer's only information concerning that crucial fact was Tallmadge's negative answer on the FTR.

he does not remember exactly what was said. R.T., March 11, 1986, at 12. Although specific findings of fact were waived by the defendant, there are indications that the trial judge simply did not believe Tallmadge's self-serving story.[6]

The problem is that neither the parties nor the court below sought to develop this evidence, probably because estoppel was not raised as a defense at trial. Had it been, the government might well have cross-examined Tallmadge in greater detail about his conversation with the dealer or even called the gun dealer to testify. Because the question of reasonable reliance on misleading information is essentially factual, we should not be answering it at this level, and certainly not on the thin record presented in this case.

## IV.

Finally, I fear the majority's analysis reads scienter into statutes we have consistently held require none. If that is so, the opinion ignores the teachings of our cases and conflicts with the Eleventh Circuit's decision in *United States v. Bruscantini*, 761 F.2d 640 (11th Cir.), *cert. denied*, 474 U.S. 904, 106 S.Ct. 271, 88 L.Ed.2d 233 (1985).

Bruscantini entered a plea of *nolo contendere* to a state burglary charge and was told by a state judge and a state prosecutor that this disposition of his case was not a conviction. Later he obtained two firearms and was charged with unlawful receipt of firearms by a convicted felon. Citing *Cox* and *Raley*, the defendant argued that the government should be estopped because authoritative state officials assured him he was not a convicted felon. The Eleventh Circuit rejected this defense, partly because "knowledge of one's status as a convicted felon is not an element of the offense." *Id.* at 641–42.[7]

As *Bruscantini* recognized, being misled by government officials can only exonerate a defendant by negating the existence of a mental state essential to the crime charged. Thus, Tallmadge might have escaped conviction under section 922(a)(6) (which prohibits knowingly making false representations in the FTR) because his state of mind was a specific element of that crime. But Tallmadge's belief that he was entitled to purchase firearms is not an element of the crimes of receipt and possession. These crimes have been "uniformly interpreted as requiring only that the defendant was in fact a convicted felon, and not that he actually knew he was a felon." *Newton v. Superior Court*, 803 F.2d 1051, 1059 (9th Cir.1986) (Alarcon, J.) (citing authority from six circuits). Thus, in *United States v. Quiroz*, 449 F.2d 583, 585 (9th Cir.1971), we held that scienter was not required for a conviction under section 1202(a)(1). Applying *Quiroz*, in *United States v. Locke*, 542 F.2d 800, 801 (9th Cir.1976), we held it irrelevant that Locke had been advised by a public defender that he was not a convicted felon.

Similarly, in *United States v. Pruner*, 606 F.2d 871 (9th Cir.1979), defendant argued that his conviction for unlawful receipt of a firearm should be reversed because he did not know his earlier crime carried a maximum term of imprisonment exceeding one year. Although we recognized that the gun control statutes may work harsh results in some cases, we held that the defendant's knowledge of his status was not a defense:

It may be true that the purchase of handguns in itself is an innocent act and that because of the innocence of the act there exists the possibility of injustice to one who purchases a gun, unaware that he had committed a crime that was punishable by a term of imprisonment exceeding one year. However, we believe that the potential for such injustice is outweighed by the danger created if guns are al-

---

6. For example, after the evidence was in, the district judge articulated his suspicion that "Mr. Tallmadge knew it was a crime." R.T., April 21, 1986, at 10.

7. The court also noted that *Cox* and *Raley* involved state officials interpreting state law, while *Bruscantini* involved state officials purporting to interpret federal law. 761 F.2d at 641–42.

lowed to fall into the hands of dangerous persons such as felons.

606 F.2d at 874. The court also noted that the FTR should have put Pruner on notice that "he must either determine for himself that his past crime did not carry a possible term of imprisonment exceeding one year or risk violating [the law]." *Id.*

Therefore, even if Tallmadge erroneously believed that the redesignation of his conviction allowed him to purchase guns, the fact that he was in reality a convicted felon controls. Because his state of mind has no relevance, it matters not whether he came to that belief as a result of erroneous advice or on his own. *Pruner* recognized that this rule may work harsh results in some cases; this may well be one. I respectfully suggest, however, that we are not free to temper this result, no matter how unpalatable we may find it.

### Epilogue

It is the nature of dissents that they bristle with Cassandran prophecies; this one is certainly no exception. Fortunately, however, most of us lack Cassandra's clairvoyance and few of the calamities we predict come to pass. I hope that in this, too, my dissent will prove unexceptional. If the majority opinion is read narrowly—as a judicial response to a perceived injustice and not as a wholesale reassessment of important legal principles—the case will be a ripple on the waters of the law, not the tidal wave my dissent predicts.

However, it would be unfortunate if one aspect of the majority opinion went unnoticed and unheeded. That my distinguished and thoughtful colleagues are willing to give Tallmadge his freedom suggests to me a deep-seated judicial discomfort with this case and others like it. It is a discomfort I share, although I would not assuage it as have my colleagues. The fact of the matter is, however, that we see much in this area of the law that pricks the conscience. The offenses of which Tallmadge was convicted straddle the gap between state and federal law. Frequently, the policies of the two governments are at loggerheads: The state wishes to give the defendant a clean slate, yet federal law makes the record indelible. Again and again we see defendants who have been given solemn assurances by those they justifiably trust—state judges, prosecutors, defense counsel—that they may now enjoy all rights of citizenship, including that of owning a gun, yet find that they have committed a federal crime when they exercise that supposed right. By and large, these tend to be hard cases, evoking far more sadness than anger. Yet, when they are prosecuted, and when they inevitably result in convictions, we have the uncomfortable duty of affirming. We normally discharge that duty, distasteful though it may be.

But the discomfort is there and, as the result in this case demonstrates, must be reckoned with. A good start might well be with more judicious exercise of prosecutorial discretion. This is not the first case of this kind where I had to wonder whether the prosecution served any purpose other than to pad the prosecutor's batting average. Also, because of the intergovernmental nature of the offense, wisdom and prudence would seem to counsel an effort by the federal authorities to educate state officials as to the intricacies of the applicable federal law, thereby stemming the flow of misinformation to individuals given clemency by state authorities. While government counsel assure us from time to time that such an effort is "in the works," we have yet to see its consequences.

More fundamentally, Congress may wish to consider whether individuals whose state convictions are expunged, sealed, pardoned or retroactively reduced under state law ought not, as a matter of comity and leniency, be given the same grace under federal law. Finally, judicial discomfort may eventually become so severe that it may become appropriate to revisit—through the en banc process, of course—our decisions giving sections 922(a) & (h), 924 and 1202(a) a strict interpretation.

I leave these thoughts to another day and hope only that Tallmadge is not the only one who has learned something about

the workings of the law as a result of this case.