**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Daniel J. SMITH, Defendant-Appellant.**

**No. 85–3178.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 5, 1986.

Decided Oct. 16, 1986.

John E. Lamp, James R. Shively, Asst. U.S. Atty., Spokane, Wash., for U.S.

Dustin Deissner, Van Camp & Bennion, P.S., Spokane, Wash., for Smith.

Before POOLE, NORRIS, and BEEZER, Circuit Judges.

POOLE, Circuit Judge:

Daniel J. Smith appeals from his conviction for possession of cocaine with intent to distribute, 21 U.S.C. § 841(a)(1), and unlawful use of a telephone to facilitate a conspiracy, 21 U.S.C. § 843(b). Smith argues that the police lacked probable cause to arrest him, and thus the district court erred in refusing to suppress the evidence seized incident to that arrest. He also contends that the government's conduct in this case constitutes entrapment as a matter of law and was, in fact, so outrageous as to violate his due process rights. Finally, Smith argues that the district court erred in denying his post-trial motions for a verdict of acquittal or, in the alternative, for a new trial because the jury verdicts were inconsistent. We affirm.

## FACTS AND PROCEEDINGS

In 1984, Michael Smith, the brother of appellant, approached police officers of the Spokane Police Department and expressed his desire to serve as a confidential informant. The Spokane Police Department referred Michael Smith to the Drug Enforcement Agency (DEA), informing the DEA that Michael Smith could arrange to purchase cocaine from Daniel.

According to Michael, the DEA agents told him that they already had evidence to arrest Daniel for laundering drug money through his Spokane sandwich shop. The agents told Michael that they wanted him to arrange for Daniel to purchase some drugs. Michael agreed to try. At this meeting, Michael also informed the agents that Daniel was having financial difficulties because he owed taxes.

Michael contacted Daniel several times in August telling Daniel that he needed money and that he wanted Daniel to purchase drugs for him so he could resell them. At first, Daniel refused to arrange such a purchase. Finally, in late August, Michael arranged to purchase cocaine from Daniel. That transaction, however, was never finalized because Michael refused to provide his brother with the purchase money in advance.

Later, Michael agreed to front the money, and in October, Daniel finally agreed to sell Michael an ounce of cocaine. On October 19, Michael went to Daniel's home and paid him $2,300.00 in marked money provid-

ed by the DEA. Under surveillance, Daniel and his wife left their home and drove to a grocery store. Daniel entered the store and emerged a little while later with a bag apparently carrying groceries. He next traveled to a bakery where he left with another grocery bag. He then proceeded to a parking lot of a funeral home where the agents lost surveillance for a couple of minutes. When the agents reestablished his location, he was exiting the parking lot. He then drove to his restaurant where his wife left the car. Thereafter, Daniel drove north and finally turned off the main highway onto an unpaved road which serviced three homes. One of the homes belonged to co-defendant Richard Spies. Daniel remained at this location for approximately one hour and fifteen minutes.

Upon leaving, Daniel stopped at a public telephone and placed a short call. After leaving the phone booth, he drove south towards Spokane. While other agents continued to follow Daniel, agent Hector Sanchez went to the public phone and called Michael who was still waiting at Daniel's residence. Michael said he had not received a call from Daniel but that he had just been called by Daniel's wife who told him that Daniel had called her and asked her to inform Michael that he was on his way back to the house.

Meanwhile, Daniel had stopped at and entered an apartment building in Spokane where he remained for approximately twenty-five minutes. Upon exiting, he drove to his house where he delivered one ounce of cocaine to his brother. Michael then left the house and met with DEA agents to whom he turned over the cocaine. Daniel was not arrested at this time.

Agent Sanchez thereafter showed Michael a photograph of Richard Spies. Michael told Sanchez that he recognized Spies as the same man he had seen in photographs with Daniel which Daniel had displayed at his home. Michael said that his brother had identified the man as a wealthy cocaine dealer whom his wife had known for years. At the suppression hearing, Michael admitted recognizing Spies from pho-

tos at his brother's house, but denied having told Sanchez that Spies was a cocaine dealer.

Sometime in November, Daniel sold his van to Michael for $1,200.00. Michael did not have the cash at the time, but said he would pay Daniel in the future. Michael then suggested a second purchase of cocaine, and a purchase was set up for December 11, 1984. That evening, Michael met his brother at a tavern and once again gave him $2,300.00 in DEA marked money. Daniel left the tavern and headed north out of Spokane in the direction of Spies' home. The highway on which he was traveling later forked, and Daniel proceeded along one road for a short period. He then turned into a parking lot, drove through the lot, and continued north on the other road. After turning off the highway and traveling on different side roads, Daniel stopped his car briefly. He then proceeded to Richard Spies' house, where he remained for approximately one hour.

Shortly after leaving this residence, Daniel stopped at a staged accident scene where agents then arrested him. Upon searching him, agents found a plastic baggie containing one ounce of cocaine and $100 of the marked money.

Smith was indicted on one count of conspiracy to distribute cocaine, one count of distribution of cocaine, one count of possession with intent to distribute cocaine, and two counts of unlawful use of communication facility to facilitate a conspiracy. Richard Spies was also indicted on the conspiracy charge and was charged separately with two counts of distribution of cocaine, as well as separate counts of possession of cocaine, marijuana, and psilocubin.

Smith filed pre-trial motions to dismiss the indictment on the grounds of entrapment and outrageous conduct, and to suppress the evidence seized incident to arrest as well as Smith's confession. A three-day evidentiary hearing was held after which the district court granted the motion to suppress the confession, but denied all other motions.

The case proceeded to trial, and Smith was allowed to argue and present evidence supporting an entrapment defense. The jury also was given an entrapment instruction. The jury returned a verdict finding Smith "not guilty by reason of entrapment" on the conspiracy and distribution counts as well as one of the telephone facilitation counts. The jury found Smith guilty on the other telephone facilitation count as well as the possession count.

Smith moved for a judgment of acquittal or for a new trial claiming that the verdicts were impermissibly inconsistent. The district court denied the motion, and Smith timely appealed.

## DISCUSSION

### A. Probable Cause to Arrest

Smith argues that the police lacked probable cause to arrest him after he left Spies' home, and therefore, any evidence seized during the arrest must be suppressed. See Florida v. Royer, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). He also argues that the arrest was a pretext to search him for cocaine and thus was invalid. The district court denied the motion finding that it was not unreasonable for the agents to wait to arrest Smith until the second cocaine transaction. Although the court did not specifically address the issue of probable cause, a finding of probable cause is implicit in the court's decision to deny the suppression motion.

■ The test for probable cause is whether "facts and circumstances within the officer's knowledge * * * are sufficient to warrant a prudent person, or one of reasonable caution, [to believe], in the circumstances shown, that the suspect has committed, is committing or is about to commit an offense." Michigan v. DeFillippo, 443 U.S. 31, 37, 99 S.Ct. 2627, 2632, 61 L.Ed.2d 343 (1979); Beck v. Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964); United States v. Greene, 783 F.2d 1364, 1367 (9th Cir.1986), cert. denied — U.S. ——, 106 S.Ct. 2923, 91 L.Ed. 2d 551 (1986) The existence of proba-

ble cause is a mixed question of law and fact. Ker v. California, 374 U.S. 23, 33–34, 83 S.Ct. 1623, 1629–30, 10 L.Ed.2d 726 (1963); United States v. Alfonso, 759 F.2d 728, 741 (9th Cir.1985). We must accept, unless clearly erroneous, the underlying facts as found by the district court; however, the district court's ultimate conclusion of probable cause is reviewed de novo. Pullman-Standard v. Swint, 456 U.S. 273, 287, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982); Greene, 783 F.2d at 1367.

■ We conclude that the agents had probable cause to arrest Smith when he left Richard Spies' house. It is undisputed that Smith had provided cocaine to his brother Michael in October. Upon receiving the money for that purchase, he had been followed by the agents and observed to stop at a grocery store, a bakery, a parking lot, his sandwich shop, an area north of Spokane containing three residential homes, and an apartment building. Of these locations, the parking lot, residential area, and the apartment building were the most suspicious. As to the others, Smith appeared to have a legitimate purpose for stopping. He shopped at the grocery store and the bakery and dropped off his wife at the sandwich shop.

Of the remaining three locations, Smith was observed to place a phone call shortly after he left the residential area. Agents were able to ascertain that Smith called his wife requesting her to call Michael and tell him that Smith was on his way back. This message suggests that Smith had just succeeded in obtaining the cocaine, thereby focusing attention on the residential area as the likely place for the cocaine purchase. This suspicion was later heightened by the fact that Michael identified a photograph of one of the residential owners as a person he had seen in photographs in his brother's residence.

On December 11, 1984, the date of the second cocaine transaction, Smith took the marked money and headed north out of the city and in the direction of Spies' home. Instead of taking a direct route, he traveled a roundabout path and even stopped

for a brief moment, behavior which suggests an effort to detect whether he was being followed. Smith then went to Spies' home. In light of the prior information as well as the fact that Smith had left the tavern for the specific purpose of purchasing cocaine for his brother, we hold that the agents had probable cause to believe that Smith had obtained the cocaine when he left Spies' residence.

Smith argues that even if the agents had probable cause to arrest him, their delay in carrying out that arrest until the second cocaine purchase and the timing of the arrest demonstrate that the arrest was a pretext. He claims that the government's motivation for waiting and arresting him was to be able to catch him in possession of cocaine.

■ An arrest may not be used as a pretext to search for evidence. *United States v. Lefkowitz*, 285 U.S. 452, 467, 52 S.Ct. 420, 424, 76 L.Ed. 877 (1932); *Williams v. United States*, 418 F.2d 159, 161 (9th Cir.1969), *aff'd*, 401 U.S. 646, 91 S.Ct. 1148, 28 L.Ed.2d 388 (1971). Whether an arrest is a mere pretext to search turns on the motivation or primary purpose of the arresting officers. *Williams*, 418 F.2d at 161. Courts have found improper motivation where the defendant is arrested for a minor offense so as to allow police to search for evidence of some other unrelated offense for which police lack probable cause to arrest or search. *See Taglavore v. United States*, 291 F.2d 262 (9th Cir.1961). It has also been found where the police intentionally delay making an arrest until the defendant enters some premises which the police wish to search. *Williams*, 418 F.2d at 161.

■ None of these situations exist in this case. The arrest was for the crimes being investigated, and the search was incident to that arrest. Moreover, the agents' delay in arresting Smith until the second cocaine transaction was justified by the need to obtain more evidence, especially concerning the source of the cocaine. *See id.* Government agents are under no obligation to arrest a suspect or halt their investigation as soon as they have the minimum evidence necessary to establish probable cause. *United States v. Leon*, 460 F.2d 299, 300 (9th Cir.1972) (per curiam).

**B.** *Entrapment or Outrageous Conduct by the Government*

■ Smith contends that the undisputed facts establish entrapment as a matter of law. We review questions of law *de novo*. *Christensen v. United States*, 755 F.2d 705, 707 (9th Cir.1985), *cert. denied*, ── U.S. ──, 106 S.Ct. 2914, 91 L.Ed.2d 543 (1986). Smith's argument that the government's conduct was so outrageous as to violate his due process rights is also reviewed *de novo*. *United States v. Bogart*, 783 F.2d 1428, 1431 (9th Cir.1986).

1. *Entrapment*

■ Entrapment is generally a jury question. *United States v. Marcello*, 731 F.2d 1354, 1357 (9th Cir.1984). To establish entrapment as a matter of law, the defendant must point to undisputed evidence making it patently clear that an otherwise innocent person was induced to commit the illegal act by trickery, persuasion, or fraud of a government agent. *United States v. Hsieh Hui Mei Chen*, 754 F.2d 817, 821 (9th Cir.), *cert. denied*, ── U.S. ──, 105 S.Ct. 2684, 86 L.Ed.2d 701 (1985); *see Sherman v. United States*, 356 U.S. 369, 373–76, 78 S.Ct. 819, 821–22, 2 L.Ed.2d 848 (1958). If the defendant is predisposed to commit the crime, then the entrapment defense is unavailable. *Hampton v. United States*, 425 U.S. 484, 488–89, 96 S.Ct. 1646, 1649, 48 L.Ed.2d 113 (1976); *United States v. Russell*, 411 U.S. 423, 436, 93 S.Ct. 1637, 1645, 36 L.Ed.2d 366 (1973). In determining whether a criminal defendant is so predisposed, we examine:

(1) the character or reputation of the defendant, including any prior criminal record;

(2) whether the government initially made the suggestion of criminal activity;

(3) whether the defendant engaged in the criminal activity for profit;

(4) whether the defendant evidenced reluctance to commit the offense that was overcome by repeated government inducement or persuasion; and

(5) the nature of the inducement or persuasion supplied by the government.

*United States v. Busby,* 780 F.2d 804, 807 (9th Cir.1986). Of these factors, the defendant's reluctance to engage in criminal activity is the most important. *Id.*

▮ In this case, the jury concluded that Smith had been entrapped as to the October 23rd transaction, but rejected the entrapment defense as to the December 11th charges. Such verdicts are not inconsistent. An initial entrapment does not immunize a defendant from criminal liability for subsequent transactions that he readily and willingly undertook. *United States v. North,* 746 F.2d 627, 630 (9th Cir.1984), *cert. denied,* 470 U.S. 1058, 105 S.Ct. 1773, 84 L.Ed.2d 832 (1985). Thus, the issue is whether the undisputed evidence establishes that Smith was entrapped as a matter of law with respect to the December 11th cocaine purchase.

▮ It is undisputed that Michael, the government informant, initiated both cocaine deals and that Smith on several occasions refused to carry out the purchases. In addition, Smith was having financial difficulties, and Michael owed Smith money for the van he had purchased from him. Smith also had emotional problems. He was estranged from most of his family, and upon Michael's return to Spokane, he and Michael were seeking to establish a closer relationship. Balanced against these factors is the fact that, as Smith admits, he had a reputation as a drug user and dealer. Although he was no longer using drugs, he admits that he still had drug contacts. Moreover, when arrested, Smith had $100 of marked DEA money, demonstrating that he had made a profit for arranging the drug transaction. *Cf. Sherman,* 356 U.S. at 375, 78 S.Ct. at 822 (no evidence that defendant made a profit on the narcotics sale and his prior drug convictions were

five- and nine-years-old). Because it is not patently clear on the record that Smith was not predisposed to commit the crime, the issue was one for the jury to decide after weighing the testimony and credibility of the witnesses. Accordingly, the district court did not err in concluding that Smith had failed to demonstrate entrapment as a matter of law.

### 2. Outrageous Conduct

▮ Smith argues that the government's conduct was so outrageous that it violated his due process rights. A defendant may raise a due process-based outrageous government conduct defense to a criminal indictment. *Bogart,* 783 F.2d at 1433. In evaluating such a defense, the court looks only to the government's conduct objectively without regard to the defendant's criminal predisposition. *Id.*

▮ Smith claims that the government's conduct was outrageous because it generated new crimes merely for the sake of pressing charges against him. The outrageous conduct defense is not limited to cases where law enforcement conduct involves extreme physical or mental brutality, but extends also to those situations where the crime is manufactured by the government "from whole cloth." *Id.* at 1436, 1438. In the latter situation, the reasoning is that no crime would have been committed absent the government's interference and engineering of the crime. *Id.* at 1436. However, courts must be careful not to apply this due process defense so broadly that it swallows up the subjective entrapment defense. *United States v. Jannotti,* 673 F.2d 578, 608 (3d Cir.) (en banc) ("We must be careful not to undermine the Court's consistent rejection of the objective test of entrapment by permitting it to reemerge cloaked as a due process defense."), *cert. denied,* 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982). Consequently, law enforcement conduct becomes constitutionally unacceptable only when it "shocks the conscience." *Bogart,* 783 F.2d at 1438.

▬ The government's conduct in this case, although close, did not cross over the line into a due process violation. The agents used Smith's own brother to solicit the drug transactions, but those two had not been very close in the past, and the agents had no indication that Smith was emotionally dependent on his brother.[1] The agents were aware that Smith had tax problems and that Michael owed him money for the van; however, the record does not indicate that they knew how large this liability was or whether Michael's payment was necessary to meet the liability. Concerning Smith's reputation, the agents understood that while Smith was not using drugs, he still had contacts to acquire them, although the agents were not sure whether he was presently dealing. Such an understanding was not patently unreasonable since Smith admits that he used and dealt drugs in the recent past. Finally, the agents supplied the money and the opportunity for Smith to arrange the drug sale, but they did not suggest or set up the source from which Smith would purchase the cocaine. Smith alone arranged for the buy.

We recognize that government agents may lawfully use methods that may cause concern if judged by abstract societal standards. *See Bogart*, 783 F.2d at 1438. But although some aspects of this case are disturbing, we do not find the government conduct sufficiently outrageous to constitute a violation of Smith's due process rights.

### C. *Inconsistent Verdicts*

▬ Smith and Richard Spies were jointly indicted and tried. The jury acquitted Smith of Counts 1, 2, and 9. Count 1 of the indictment charged Smith with conspiring with Spies to distribute cocaine. Count 2 charged Smith with distribution of cocaine on October 19, 1984, and Count 9 charged use of the telephone on that date to facilitate the conspiracy to distribute.

Of the remaining counts, Counts 3 and 10 respectively charged Smith with possession of cocaine on December 11, 1984 and use of the telephone on that date to facilitate the conspiracy. The jury convicted him of these two counts.

Smith moved for a judgment of acquittal, or, in the alternative, for a new trial on the ground that the jury's verdicts were impermissibly inconsistent.[2] The court denied the motions by written order, holding that a defendant may not upset a verdict just because it is inconsistent with an acquittal on some other count. *United States v. Powell*, 469 U.S. 57, 105 S.Ct. 471, 479, 83 L.Ed.2d 461 (1984). Since this was a purely legal determination, we review the decision *de novo*. *See United States v. McConney*, 728 F.2d 1195, 1201 (9th Cir.) (en banc), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

In *Powell*, the defendant was convicted of three counts of using the telephone in "committing and in causing and facilitating" a conspiracy and the defendant's possession of cocaine. 105 S.Ct. at 474. The defendant, however, was acquitted of the underlying conspiracy and possession charges. *Id.* Because the verdicts were inconsistent, the defendant argued that her conviction must be reversed.

The Supreme Court, relying on the rule of *Dunn v. United States*, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356 (1932), refused to set aside the verdicts. The Court observed that "where truly inconsistent verdicts have been reached, '[t]he most that can be said * * * is that the verdict show that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt.'" *Powell*, 105 S.Ct. at 477 (quoting *Dunn*, 284 U.S. at 393, 52 S.Ct. at 190). It rejected, as both imprudent and unworkable, a rule allowing criminal defendants to challenge in-

---

1. The agents did not become aware that Smith had emotional problems until approximately one-half hour before the second transaction on December 11.

2. Smith does not argue that the evidence was insufficient to sustain the verdicts.

consistent verdicts on the ground that in their particular case the jury's verdict was not in fact the product of lenity. "Such an individualized assessment of the reason for the inconsistency would be based either on pure speculation, or would require inquiries into the jury's deliberations that courts generally will not undertake." *Powell,* 105 S.Ct. at 478.

Smith attempts to distinguish and thereby avoid the rule affirmed in *Powell* by pointing out that unlike *Powell* where the jury simply found the defendant not guilty of certain offenses, the jury in this case specifically acquitted Smith of the conspiracy count because they concluded he had been entrapped. This distinction, however, is unimportant. Just as it is impossible to discern from a verdict of "not guilty" whether the jury was speaking their real conclusions, it is impossible to tell whether the jury in this case actually agreed that Smith had been entrapped as that defense is defined under federal law. As noted by the Court in *Powell,* "[i]t is * * * possible that the jury, convinced of guilt, properly reached its conclusion on the [December 11th offenses], and then through mistake, compromise, or lenity, arrived at an inconsistent conclusion on the [underlying conspiracy charge]." *Powell,* 105 S.Ct. at 477.

Smith contends, nevertheless, that his telephone solicitation conviction should be reversed because it was the result of the jury's failure to follow Instruction No. 14. In that instruction, the court told the jury "[s]ince an essential element of this offense is that it be performed in furtherance of a conspiracy to distribute a controlled substance, you may find the accused guilty only if you have first found him guilty of the conspiracy itself. (Count 1)." This argument also was rejected in *Powell.*

Obviously, the jury did not literally follow the court's instructions in this case. However, Smith is assuming that it was Instruction No. 14 that was disregarded. This assumption, however, is not necessarily correct.[3] All that can be said with certainty is that the verdicts are inconsistent. "Although such an instruction might indicate that the counts are no longer independent, if inconsistent verdicts are nevertheless reached those verdicts still are likely to be the result of mistake, or lenity, and therefore are subject to the *Dunn* rationale." *Powell,* 105 S.Ct. at 479. Accordingly, the jury verdicts are insulated from review on this ground as well. *Id.*[4]

AFFIRMED.

---

**3.** In fact, there is a perfectly rational explanation of the verdict. The charges included only one conspiracy count but two counts of unlawful use of a telephone to facilitate a conspiracy, one for each of the drug transactions. The jury could easily have concluded on the evidence that entrapment was a valid defense to the October 19 transaction, while still believing that by the December 11 transaction, the taint of impermissible police conduct had been removed. Because there was a single count of conspiracy,

however, the jury could rationally have felt compelled to acquit due to the initial police misconduct, while still finding enough agreement on December 11 to support the facilitation conviction.

**4.** This reasoning applies equally to Smith's argument that the jury refused to follow Instruction No. 13 with regard to his possession conviction.