956 F.2d 276
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff, Appellee,
v.
Ray Owen SLAUGHTER, Defendant, Appellant.
 No. 90-10543.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Sept. 13, 1991.
Decided Feb. 27, 1992.
 
 1
 Before CANBY and KOZINSKI, Circuit Judges, and CARROLL*, District Judge
 
 
 2
 MEMORANDUM**
 
 OVERVIEW
 
 3
 Ray Owen Slaughter was convicted of one count of possession of a controlled substance and one count of distribution of a controlled substance, in violation of 21 U.S.C. §§ 844 and 841(a)(1). Slaughter appeals his conviction of distribution alleging that entrapment continued throughout the series of drug transactions in which he was involved and that the trial court improperly refused his requested jury instruction. This Court has jurisdiction pursuant to 28 U.S.C. § 1291. We affirm.[1]
 
 FACTS
 
 4
 Appellant Slaughter became an investigator/polygraph examiner for the Clark County Public Defender in Nevada in 1974, and at the same time developed a private practice. Following his second divorce in 1981 or 1982, Slaughter became an alcoholic and later a cocaine addict.
 
 
 5
 In 1987, Supervisory Special Agent Togliatti was head of the White Collar Crime Squad in the Federal Bureau of Investigation's (FBI) Las Vegas office. Togliatti was involved in the relocation of Freddy Pellicone, an individual who was working as an undercover operative for the FBI in New York in order to reduce his charges for distribution of cocaine. Belinda Antal, Pellicone's girlfriend, had also worked for the FBI on Pellicone's behalf. The FBI decided to relocate Antal and Pellicone to Las Vegas in April of 1987 due to concerns for their safety.
 
 
 6
 Pellicone and Antal contacted the FBI on April 12, 1987, the day after their arrival in Las Vegas. In an interview with Antal that day, Togliatti discovered that Antal had previously frequented an establishment where Slaughter often went. Togliatti personally knew Slaughter and felt he "could be involved in the sale of cocaine", and requested that Antal contact Slaughter. Antal was not offered money at that time. The FBI did not request Pellicone's assistance.
 
 
 7
 The next day, Antal called Slaughter at his office. She told Slaughter that she had met him before and that she was back in town looking for a job. That evening they met at the Prime Rib Restaurant and Bar. Although Slaughter acknowledged her at the restaurant, he testified later that he did not recognize her. Antal was a tall, young woman, less than half Slaughter's age, whom Slaughter found to be provocatively dressed and "very attractive." They had drinks and discussed a waitress job opening of which Slaughter was aware.
 
 
 8
 Antal and Slaughter were joined by a woman named Robbin Kenny. After Slaughter and Kenny pooled their money, Slaughter went into the kitchen area of the restaurant. A man, introduced by Slaughter as Richard, came out of the kitchen and passed a package to Slaughter. Kenny first went into the restroom with the package; when she returned, Slaughter also took the package with him to the restroom.
 
 
 9
 Antal, Slaughter, and Kenny then drove to Slaughter's condominium. According to Slaughter, all three ingested cocaine. Based on the amount of cocaine Antal ingested, Slaughter felt she was "a heavy cocaine user." However, at trial Antal denied using cocaine on this occasion. She did testify that she had used cocaine "socially eight, nine, maybe more" times. Kenny stated in a taped conversation that Antal had used cocaine at this first meeting.
 
 
 10
 The next day, Antal telephone Togliatti and told him what had occurred. Antal then went to Togliatti's office where they discussed a full-scale investigation and how much money Antal would be paid. Antal testified that "Mr. Togliatti said that there could be no moneys, no money at all until the investigation fully got started." Togliatti testified he would have paid Antal whether or not it led to an investigation.
 
 
 11
 The first tape-recorded conversation occurred on April 26, 1987, when Antal called Slaughter. Antal made at least five requests that Slaughter obtain cocaine for her. Slaughter refused each request and said "no" nine or ten times.
 
 
 12
 Antal next telephoned Slaughter at his office on April 28, 1987. Equipped with a body tape recorder, Antal met Slaughter at Darci's Bar and Grill that afternoon, where Antal brought up the possibility of getting some cocaine from Richard. Antal apologized to Slaughter for bringing up the subject of cocaine; Slaughter responded that he did not want to talk about it over the phone. Later, Antal had Slaughter drive her to the Union Plaza where she obtained $200 from an agent to buy two grams of cocaine. They then drove to the Prime Rib, during which time Slaughter discussed the possibility of Antal moving in with him.
 
 
 13
 When they arrived at the Prime Rib, Antal gave Slaughter the $200. Slaughter purchased the cocaine from someone in the kitchen or office and returned to Antal. After giving her the cocaine, Antal allowed him to kiss her cheek. Their conversation contained provocative and sexually explicit topics.
 
 
 14
 Antal next called Slaughter on April 30, 1987. They agreed to meet at the Prime Rib; Slaughter asked Antal if this was a "date." At the Prime Rib, Antal told Slaughter she wanted an "eightball," or three and one-half grams of cocaine. Antal gave Slaughter $250, and Slaughter went to the kitchen. After Slaughter returned, Richard came over and handed Slaughter a package, who then handed it to Antal. During the conversation, Antal repeatedly suggested that Slaughter party with her and her girlfriends in her suite. This was a cover story so that Slaughter could be arrested in private. Antal later left the Prime Rib without Slaughter.
 
 
 15
 On May 1, 1987, Antal called Slaughter and asked him to "pick up something." Slaughter asked her if the only reason she wanted to be around him was for cocaine.
 
 
 16
 On May 2, Antal called Slaughter again. Slaughter declined another offer to her party but agreed to meet Antal at the Prime Rib that evening. While having drinks that evening, Antal asked Slaughter if she could get some cocaine. Slaughter mentioned that he was already picking up some cocaine for a waitress friend who worked at the Bavarian Chalet. Antal gave Slaughter $250 to purchase another eightball. After a visit to the kitchen, Slaughter handed a package of cocaine to Antal. Antal suggested that they meet later that evening at the Bavarian Chalet.
 
 
 17
 Later at the Bavarian Chalet, Slaughter told Antal that he delivered the cocaine to the waitress, who gave him some cocaine to make up for the money she was short. The FBI arrested Slaughter as he left the Bavarian Chalet.
 
 
 18
 Slaughter was charged with three counts of Distribution of a Controlled Substance in violation of 21 U.S.C. § 841(a)(1). The first trial was held between April 11 and April 15, 1988. The jury acquitted Slaughter on Count 1 (the April 28, 1987 transaction) and convicted him on Counts 2 and 3 (the April 30 and May 2, 1987 transactions, respectively).
 
 
 19
 Slaughter appealed his convictions. This Court reversed the convictions on both counts and remanded for retrial. United States v. Slaughter, 891 F.2d 691 (9th Cir.1989) (hereinafter, "Slaughter I "). This Court held that the trial court abused its discretion by refusing to admit the out-of-court taped statements of Robbin Kenny concerning her observation that Antal used cocaine. Id. at 697-98. This Court also held that the court should have given the jury instruction for continuing entrapment set forth in United States v. North, 746 F.2d 627, 629 (9th Cir.1984), cert. denied, 470 U.S. 1058, 105 S.Ct. 1773, 84 L.Ed.2d 832 (1985). Id. at 699-70.
 
 
 20
 The second trial occurred on October 1 to October 5, 1990. After the government rested its case, Slaughter moved for a Judgment of Acquittal, which was denied. The motion was renewed after both sides had rested and was denied by the trial court. The jury returned a verdict of guilty on the lesser-included offense of Count 1 of the Redacted Indictment (the April 30 transaction) for simple possession of a controlled substance, and a guilty verdict on Count 2 of the Redacted Indictment (the May 2 transaction) for distribution. Slaughter renewed his Motion for Judgment of Acquittal only as to Count 2 of the Redacted Indictment; this was denied. Slaughter filed a timely appeal to this Court. He is only appealing the conviction for distribution of a controlled substance.
 
 DISCUSSION
 
 21
 1. Denial of appellant's motion for judgment of acquittal
 
 
 22
 In the retrial of this case, the trial judge determined that under principles of collateral estoppel, the effect of the acquittal for the April 28, 1987 transaction by the first jury meant that the jury had found that the defendant was entrapped by the government. The jury was instructed that, "as a matter of law, the defendant Ray Owen Slaughter, was entrapped with respect to the distribution of cocaine on April 28, 1987." Slaughter argues that his initial entrapment continued to the subsequent transactions as a matter of law.
 
 
 23
 Whether the undisputed facts establish entrapment as a matter of law is reviewed de novo as a question of law. United States v. Smith, 802 F.2d 1119, 1125 (9th Cir.1986).
 
 
 24
 Slaughter attempts to find support in North, in which this Court found that whether the initial entrapment had extended through the later transactions "was a question of fact that the instruction properly left to the jury." North, 746 F.2d at 630. This Court pointed to various factors supporting its conclusion that continuing entrapment was a jury question: the amount of time which had passed since the initial transaction, the lack of contact with the government informant, the lack of alleged threats, and the escalating volume of trade. Id. at 630. Appellant argues that this Court should apply these factors to determine whether there was entrapment as a matter of law in this case, contending that various facts distinguish this case from North, including: (1) the fact that the time frame for all transactions was only five days; (2) there was no significant escalation in volume sold; (3) Slaughter did not profit from the transactions; and (4) Antal did not cease involvement in the later transactions.
 
 
 25
 However, the Court in North did not hold that the factors cited could be used to establish entrapment as a matter of law; it merely found those factors confirmed that there was a question for the jury regarding entrapment in the subsequent transactions. In fact, this Court held that an initial entrapment does not immunize a defendant from criminal liability for subsequent transactions that he readily and willingly undertook. Id.
 
 
 26
 In United States v. Smith, 802 F.2d 1119 (9th Cir.1986), this Court set forth the standard for evaluating whether there is entrapment on a subsequent transaction as a matter of law. This Court stated, "[t]o establish entrapment as a matter of law, the defendant must point to undisputed evidence making it patently clear that an otherwise innocent person was induced to commit the illegal act by trickery, persuasion, or fraud of a government agent." Smith, 802 F.2d at 1124; see also United States v. Hsieh Hui Mei Chen, 754 F.2d 817, 821 (9th Cir.), cert. denied, 471 U.S. 1139, 105 S.Ct. 2684, 86 L.Ed.2d 701 (1985). The Court concluded "[b]ecause it is not patently clear on the record that Smith was not predisposed to commit the crime, the issue was one for the jury to decide after weighing the testimony and credibility of the witnesses." Smith, 802 F.2d at 1125. This Court further noted that entrapment is generally a jury question. Smith, 802 F.2d at 1124; United States v. Marcello, 731 F.2d 1354, 1357 (9th Cir.1984).[2]
 
 
 27
 Slaughter argues, however, that the evidence of entrapment is so clear that no rational jury could have failed to find that he was entrapped. This Court has identified various factors for determining whether a defendant was entrapped:
 
 
 28
 (1) the character or reputation of the defendant, including any prior criminal record;
 
 
 29
 (2) whether the government initially made the suggestion of criminal activity;
 
 
 30
 (3) whether the defendant engaged in the criminal activity for profit;
 
 
 31
 (4) whether the defendant evidenced reluctance to commit the offense that was overcome by repeated government inducement or persuasion; and
 
 
 32
 (5) the nature of the inducement or persuasion supplied by the government.[3]
 
 
 33
 United States v. Bonanno, 852 F.2d 434, 438 (9th Cir.1988), cert. denied, 488 U.S. 1016, 109 S.Ct. 812, 102 L.Ed.2d 801 (1989); Smith, 802 F.2d at 1124-25; United States v. Busby, 780 F.2d 804, 807 (9th Cir.1986). The defendant's reluctance is the most important factor in determining whether entrapment exists. Bonanno, 852 F.2d at 438; Smith, 802 F.2d at 1125; Busby, 780 F.2d at 807; See Chen, 754 F.2d at 822 (although the defendant did not himself initiate contact with the agent, he was not reluctant and undue inducements were not used); United States v. Kidd, 734 F.2d 409, 413 (9th Cir.1984) (even if the agent had initiated the sale, there was no evidence of reluctance on the defendant's part); United States v. Abushi, 682 F.2d 1289, 1297 (9th Cir.1982) (defendants showed little resistance to participating in the transaction proposed by the agents and were not concerned with the transaction's illegal nature).
 
 
 34
 Although the defendant has no prior criminal record, and Antal made the suggestion that Slaughter buy cocaine for her on April 28, April 30, and May 2, 1987, government initiation is not determinative "so long as the government only provides the defendant with an opportunity to commit a crime which he was already predisposed to commit." Busby, 780 F.2d at 807.
 
 
 35
 The record reflects no reluctance on the part of Slaughter to distribute cocaine to Antal; indeed, on May 2 Slaughter was delivering drugs to both Antal and the Bavarian Chalet waitress. Although Slaughter argues that the delivery of cocaine to the waitress on May 2 only demonstrates that he was now approachable by others to do "similar misguided favors", there was no inducement by Antal for Slaughter to deliver cocaine to others.
 
 
 36
 Appellant contends that his reluctance was overborne by Slaughter's belief that Antal was a fellow cocaine addict due to the amount of cocaine Antal ingested on their first meeting. Slaughter likens the facts of his case to those in Sherman v. United States, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958). In Sherman, the informant met the defendant at a doctor's office where they were both being treated for drug addictions. Id. 356 U.S. at 371. The informant requested that the defendant obtain narcotics for him because of his alleged suffering. Id. After several requests, the defendant finally obtained drugs which he shared with the informant and the informant notified the authorities. The defendant was charged and convicted with giving narcotics to the informant on three occasions. Id. The Court held that based on the undisputed testimony, entrapment was established as a matter of law. Id. at 373. As support for this conclusion, the Court noted the informant's resort to sympathy, the multiple requests and refusals, the defendant's return to his addiction despite his attempts to overcome it, and the defendant's lack of profit. Id. at 373, 375-76.
 
 
 37
 Slaughter asserts that "where you are dealing with drug addicts ... entreaties to obtain drugs provides a special inducement that does not exist where the drug distributor's involvement is purely economic or the controlled substance is not highly addictive." Slaughter argues that he understood Antal's requests for cocaine as necessary to allay cravings, based on his observation of her cocaine use.
 
 
 38
 However, Sherman is clearly distinguishable: in this case, there were no entreaties based on mutual addiction and the testimony is in dispute as to whether Antal in fact ingested cocaine on the first meeting. Thus, Slaughter's alleged belief that Antal was suffering from cocaine cravings as an addict is not clearly supported by the evidence.
 
 
 39
 Although Slaughter may have been influenced by the "attractive" Antal and her suggestive comments, Slaughter offered little, if any, reluctance to obtain cocaine for Antal on each of the three occasions. Slaughter only refused to buy cocaine for Antal during the telephone call of April 26 and then apparently only because he was wary of speaking on the telephone about the subject.
 
 
 40
 In conclusion, the appellant has not demonstrated that there is "undisputed evidence making it patently clear" that he was induced to commit the subsequent drug transactions, and the question was one appropriately for the jury. Smith, 802 F.2d at 1124.
 
 
 41
 2. Refusal to give requested jury instructions
 
 
 42
 In this Circuit there are two lines of authority establishing different standards of review for determining whether a trial court improperly refused to give a requested jury instruction. United States v. Busby, 780 F.2d 804, 806 (9th Cir.1986) (abuse of discretion); United States v. Anguiano, 873 F.2d 1314 (9th Cir.) (de novo review), cert. denied, --- U.S. ----, 110 S.Ct. 416, 107 L.Ed.2d 381 (1989). However, this Court has held that it reviews de novo whether the instructions adequately cover the defense theory and that standard is properly applied here. United States v. Mason, 902 F.2d 1434, 1438 (9th Cir.1990); United States v. Lopez, 885 F.2d 1428, 1434 (9th Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 748, 107 L.Ed.2d 765 (1990).
 
 
 43
 A judge must instruct the jury on a defendant's theory of defense if it is "supported by law and has some foundation in the evidence." Mason, 902 F.2d at 1438; Lopez, 885 F.2d at 1434. It is not reversible error if the instructions viewed as a whole adequately address the defense theory, Mason, 902 F.2d at 1438, and the instructions "will reasonably be understood by the jury in the context of the whole trial." Id. at 1441. Further, a defendant is not entitled to any particular form of jury instruction as long as the instructions that are given "fairly and adequately" cover the defendant's theories of defense. United States v. Solomon, 825 F.2d 1292, 1295 (9th Cir.1987), cert. denied, 484 U.S. 1046, 108 S.Ct. 782, 98 L.Ed.2d 868 (1988); United States v. Echeverry, 759 F.2d 1451, 1455 (9th Cir.1985). This Court must also consider whether the instructions were misleading or inadequate to guide the jury's determination. United States v. Washington, 819 F.2d 221, 226 (9th Cir.1987); United States v. Patel, 762 F.2d 784, 790 (9th Cir.1985). A conviction may not rest on "ambiguous and equivocal jury instructions on a basic issue." Washington, 819 F.2d at 226.
 
 
 44
 The trial court gave the following instructions:
 
 
 45
 The defendant, Ray Owen Slaughter, has asserted that he was a victim of entrapment with respect to the charges against him. The Government must therefore prove beyond a reasonable doubt that the defendant was not entrapped.
 
 
 46
 Where a person, having no previous intention to violate the law, is talked into committing a crime by Government agents, he is entrapped, and the law, as a matter of policy, forbids his conviction.
 
 
 47
 On the other hand, where a person is already willing to commit a crime, it is not entrapment if Government agents merely provide an opportunity to the defendant to commit the crime.
 
 
 48
 In determining whether the defendant was entrapped as to the charges of Distribution of Cocaine set forth in Counts I and II of the Indictment, you must consider all the evidence in the case. In this regard, you are instructed that the Court has determined that as a matter of law, the defendant, Ray Owen Slaughter, was entrapped with respect to the distribution of cocaine which occurred on April 28, 1987. The Government must therefore prove beyond a reasonable doubt that the entrapment which existed on April 28, 1987, did not continue as to the charges contained in Counts I and II of the Indictment.
 
 
 49
 In determining this, you may find that the entrapment which existed on April 28, 1987, continued as to the criminal acts alleged in Counts I and II of the Indictment; or
 
 
 50
 You may find that the entrapment which existed on April 28, 1987, did not continue and therefore that the criminal acts alleged in Counts I and II of the Indictment are not subject to the defense of entrapment; or
 
 
 51
 You may find that entrapment existed as to one of the criminal acts alleged in Counts I and II of the Indictment but not as to the other.
 
 
 52
 In determining whether or not the defendant was entrapped, you may consider the following factors:
 
 
 53
 (1) the character or reputation of the defendant;
 
 
 54
 (2) whether the Government made the initial suggestion of criminal activity;
 
 
 55
 (3) whether the defendant engaged in the activity for profit;
 
 
 56
 (4) whether the defendant showed any reluctance;
 
 
 57
 (5) the nature of the Government's inducement;
 
 
 58
 (6) were different parties involved in the three transactions in this case; and
 
 
 59
 (7) did a substantial period of time pass between the initial entrapment which existed on April 28, 1987, and the subsequent transactions.
 
 
 60
 Nothing in this instruction is intended to limit the factors you may consider in determining whether the defendant was entrapped. Inducement by law enforcement officials may take many forms, including persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward, or pleas based on need, sympathy, or friendship.
 
 
 61
 In Slaughter I, 891 F.2d at 699-700, this Court reversed the trial court for failing to give the instruction for continuing entrapment as set forth in North, 746 F.2d at 629.[4] These instructions were given by the trial court in the second trial.
 
 
 62
 This Court also found in Slaughter I that the jury "was not properly instructed that, given the short period of time between the entrapment and the final sale 5 days later, Slaughter was not required to show he was not predisposed to commit the subsequent offenses in order to claim the entrapment defense." Slaughter I, 891 F.2d at 700. The instructions here properly focused the jury on the short time frame and the government's burden to demonstrate predisposition.
 
 
 63
 At trial, the defendant objected to the trial court's approach to the issue of continuing entrapment. Among other instructions, Slaughter tendered Defendant's Proposed Instruction Number 4 which read:
 
 
 64
 The factors to consider in determining whether the government has proven beyond a reasonable doubt that entrapment ceased are: 1. Were different parties involved in the subsequent transactions; 2. Was there a large increase in the amount of drugs involved, which would show that profit motive of the defendant replaced the initial entrapment; 3. Did a substantial period of time pass between the initial entrapment and the subsequent transactions which would prove no connection between the events.
 
 
 65
 Slaughter asserts that his proposed instruction would have assisted the trier of fact in determining whether there was continuing entrapment. He argues that jury confusion on this issue is demonstrated by the note sent to the judge which stated, "[c]an you define why the April 28 incident at the Prime Rib was considered entrapment. We need a basis for comparison to April 30 and May 2 incidents." The court did not provide an additional instruction addressing the question. Slaughter asserts that the jury's verdict of guilty for simple possession as to the April 30 transaction further demonstrates the jury confusion.[5]
 
 
 66
 Slaughter concedes that the court did include two of the three requested factors in the instruction: (1) the identity of the parties, and (2) the time frames involved. The only factor not included was whether there was "a large increase in the amount of drugs involved." The trial court determined that this particular factor was fact-specific to North. However, Slaughter argues that the two factors given were " 'buried' in a list of other factors that did not provide any basis for comparison of the transactions involved." He states that the jury needed to focus on the factors helpful for determining whether entrapment ceased and not on factors for determining whether entrapment existed.
 
 
 67
 Here, the instructions viewed as a whole adequately address the defense theory, Mason, 902 F.2d at 1438, and in fact, the jury instructions were highly favorable to Slaughter. Further, the instructions were adequate to guide the jury in determining whether the initial entrapment continued. Washington, 819 F.2d at 226.
 
 CONCLUSION
 
 68
 The district court properly denied Slaughter's Motion for Judgment of Acquittal, as appellant did not demonstrate that there was "undisputed evidence making it patently clear" that he was induced to commit the crime, and the question was one appropriately for the jury. Further, the instructions viewed as a whole adequately addressed the defense theory of continuing entrapment.
 
 
 69
 AFFIRMED.
 
 
 
 *
 The Honorable Earl H. Carroll, United States District Judge for the District of Arizona, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Cir.R. 36-3
 
 
 [1]
 This Court has requested and reviewed the extensive record from the trial court
 
 
 [2]
 At least two other circuits have also held that whether or not an initial entrapment continues through a series of criminal transactions is generally a question of fact for the jury to determine. United States v. Khubani, 791 F.2d 260 (2nd Cir.), cert. denied, 479 U.S. 851, 107 S.Ct. 180, 93 L.Ed.2d 115 (1986); United States v. Wells, 506 F.2d 924 (5th Cir.1975)
 
 
 [3]
 The factors examined by the North court are simply specific facts that reflect the general concepts of reluctance and government inducement. For example, an escalating volume of trade with its resulting increase in profit suggests that a defendant may have become less reluctant to commit the offense
 
 
 [4]
 In response to the jury's question whether entrapment applies in toto or to each individual count, the North court instructed the jury:
 One, you may find that defendant North was entrapped in the first instance and therefore all criminal acts following were the subject of the initial entrapment;
 Or you may find two, you may find that there was no entrapment and therefore none of the acts are subject to the defense of entrapment.
 Three, you may find that there was entrapment as to some of the acts, but no entrapment as to other of the acts.
 746 F.2d at 629.
 
 
 [5]
 The parties dispute whether the verdict of simple possession implies that the jury found entrapment on that date. However, this is not relevant to the Court's decision