**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Mario Alonzo MILLAN, Defendant–
Appellant.**

No. 93–10641.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 8, 1994.

Decided Oct. 4, 1994.

John Lambrose, Chief, Asst. Public Defender, Las Vegas, NV, for defendant-appellant.

Daniel R. Schiess, Asst. U.S. Atty., Las Vegas, NV, for plaintiff-appellee.

Before: FLETCHER, HALL and WIGGINS, Circuit Judges.

Opinion by Judge FLETCHER; Concurrence by Judge HALL.

FLETCHER, Circuit Judge:

Mario Millan appeals his conviction on charges relating to his unlawful possession of a firearm, counterfeit identification documents, and counterfeit immigration documents. He argues that all evidence seized pursuant to a traffic stop should be suppressed, for a number of independent reasons. He claims that the stop was pretextual because the officers would not have pulled him over absent a desire to search for evidence of more serious crime. He also claims that the officers lacked the requisite reasonable suspicion to question him about criminal matters not related to the minor safety concern for which he allegedly was stopped. He further contends that he did not voluntarily consent to the search of his car. He finally argues that the district court erred in refusing his proffer of evidence concerning the racial characteristics of thirty-two other individuals stopped by the officers in question.

We reverse and remand. The stop of Millan was pretextual, and all evidence recovered pursuant to it was "tainted fruit" and should have been suppressed. We need not reach the other issues presented in Millan's appeal.

## I

This case requires us to consider the legality of a traffic stop which led to the discovery of evidence of more serious crime. The Nevada Highway Patrol officer who stopped Millan, Kenneth Roll, had been trained in the NHP's "Highway Interdiction Program." The U.S. Magistrate Judge who initially decided Millan's motion to suppress heard evidence on this program and found that it is

> designed to promote detection and apprehension of individuals transporting contraband on Nevada's highways. NHP troopers assigned to the program attended training seminars at which specialized highway interdiction tactics, including the observation and recognition of certain "indicators" that an automobile was carrying contraband, were studied. Program participants were taught to actively look for these indicators when stopping a vehicle, and to use them as a means of developing the "reasonable suspicion" necessary for an investigatory detention of the vehicle's occupants.

ER at 182. Pursuant to this concerted effort at highway interdiction, NHP troopers were sometimes accompanied on patrol by officers from other branches of law enforcement. During his stop of Millan, Trooper Roll was accompanied in his patrol car by Lennie Larusso, a Las Vegas police officer temporarily assigned to the highway interdiction program. Larusso had no traffic enforcement responsibilities, and was along solely for interdiction purposes.

On March 13, 1993, Roll and Larusso were heading back to Las Vegas at the end of a shift. As they overtook a silver Audi, they noticed that the car had a cracked front windshield. As they pulled in behind it, the driver slowed from 55 mph to 42 mph. They put on their flashers, and the car pulled over.

Roll approached the Audi and spoke to the driver, Mario Millan. Millan had rolled down his window only about four inches, but complied with Roll's request to roll it down the rest of the way. Roll said the smell of

alcohol emanated from the car's interior. Millan gave Roll a driver's license and car registration in the name of Jorge Vasquez; Roll found the documents to be in order. During this exchange, Roll looked into the car. He observed a passenger and something that looked like a beer can at the passenger's feet, and noted that the back seat had been detached from the floor of the car and was somewhat out of position.

Roll asked Millan where he had come from and where he was going. Millan said he had just dropped off his wife at her job in a casino in the town of Stateline. Millan could not remember the name of the casino or the shift worked by his wife. He then changed his story, saying he was coming from Barstow, California, where he had been visiting friends.

Roll then asked Millan to get out of the car and perform a sobriety test. Millan complied, and passed the test. Roll then decided to give Millan a warning rather than a citation for the cracked windshield, and to warn him not to drive with open alcohol containers in the car. However, still suspicious about other illegal activity, Roll asked Millan if he had any weapons, drugs, or money in the car. Millan said he had a gun under the passenger seat. Larusso asked the passenger to get out of the car. He then retrieved the gun. Millan provided an apparently valid firearm registration card in the name of Jorge Vasquez.

At this point Roll asked Millan if he could search the car. Roll and Larusso testified that Millan said something like "sure, go ahead." Larusso searched the car and found an envelope containing sheets of uncut, blank resident alien cards and social security cards. Officers subsequently discovered that "Jorge Vasquez" was a false name and that Millan was illegally in the United States.

Millan was indicted on March 24, 1993 for unlawful possession of a firearm as an alien (18 U.S.C. § 922(g)(5)) and as a felon (*Id.* § 922(g)(1)), for making a false statement in purchasing the gun (*Id.* § 922(a)(6)), illegal reentry (8 U.S.C. § 1326), and two counter-

feit identification document counts (18 U.S.C. §§ 1028(a)(6), 1546(a)). He filed a motion to suppress all evidence seized as a result of the stop which he claimed was pretextual. A magistrate judge recommended that the motion be denied, and the district court adopted this recommendation and denied the motion. Millan then pled guilty to all six counts of the indictment, reserving his right to appeal the denial of his motion to suppress. He was sentenced to twenty-seven months of imprisonment.

## II

█ The pretextual stop doctrine is not meant to inhibit the use of evidence discovered serendipitously during legitimate traffic stops. Rather, " '[a] pretextual stop occurs when the police use a legal justification to make the stop in order to search a person or place, or to interrogate a person, for an unrelated serious crime for which they do not have the reasonable suspicion necessary to support a stop.' " *United States v. Cannon,* 29 F.3d 472, 474 (9th Cir.1994) (quoting *United States v. Guzman,* 864 F.2d 1512, 1515 (10th Cir.1988)).[1] Our circuit's caselaw has not been entirely consistent in the test it has applied to determine pretext. *Cannon,* 29 F.3d at 475–76. Some cases employ a "subjective" test: a stop is pretextual if "the motivation or primary purpose of the arresting officers" is to use the stop in order to search for evidence of an unrelated crime. *United States v. Mota,* 982 F.2d 1384, 1386 (9th Cir.1993) (quoting *United States v. Smith,* 802 F.2d 1119, 1124 (9th Cir.1986)). Recent cases utilize an "objective" test: a stop is pretextual unless a "reasonable officer," given the same circumstances, " 'would have' made the stop anyway, apart from [his or her] suspicions about other more serious criminal activity." *Cannon,* 29 F.3d at 476; *United States v. Bowhay,* 992 F.2d 229, 231 (9th Cir.1993). We find the stop here pretextual under either inquiry.

The magistrate judge made several findings that are supported by the officers' testi-

---

1. The U.S. Supreme Court has never proscribed pretextual traffic stops, but has condemned pretextual *arrests:* "[a]n arrest may not be used as a pretext to search for evidence." *United States v. Lefkowitz,* 285 U.S. 452, 467, 52 S.Ct. 420, 424, 76 L.Ed. 877 (1932).

mony. First, "photographs of the Audi introduced at the suppression hearing reveal that the car's windshield, while cracked, was by no means extensively damaged." Magistrate Judge's Report and Recommendation at 7. Second, Roll and Larusso, "en route to their offices at the end of the workday, decided to stop Millan's car for what can only be deemed a minor safety violation." *Id.* Third, the stop was initially suggested not by Roll but by metro police officer Larusso, who has "no traffic enforcement responsibilities on I–15," and whose "main duty as a police officer is drug interdiction." *Id.* at 7–8. Based on these findings, the magistrate judge concluded that "the officers' decision to stop Millan's car *was driven predominantly by a desire to further the [Interdiction] Program's goal of highway interdiction, rather than by a desire to enforce traffic or vehicle safety laws." Id.* at 8 (emphasis supplied).

## A.

■ Upon review of the record, we conclude that the magistrate judge's findings of fact are not clearly erroneous. *See Mota,* 982 F.2d at 1386 (court of appeals reviews for clear error district court's factual findings regarding pretextual stop claim). However, while we agree with the findings, we disagree with the magistrate judge's conclusions of law. He found that the officers' primary purpose in stopping Millan was a desire to engage in highway interdiction rather than a concern that Millan was violating any traffic laws or creating a safety hazard. Under our "subjective intent" cases, this finding automatically brings the stop within the definition of "pretextual." *Id.* at 1386 (stop is pretextual if the *"primary purpose* of the arresting officers" in making stop is to search for evidence of more serious crime) (emphasis supplied); *see also United States v. Gutierrez–Mederos,* 965 F.2d 800, 802 (9th Cir.1992) (applying same test), *cert. denied,* —— U.S. ——, 113 S.Ct. 1315, 122 L.Ed.2d 702 (1993); *Smith,* 802 F.2d at 1124 (same).

## B.

■ We reach the same conclusion under the "objective" standard employed in *Cannon,* 29 F.3d at 475–76. The government argues that because of Millan's cracked windshield, the stop would have been made anyway, even absent any desire to search for contraband. However, the government has failed to establish that driving with a cracked windshield is illegal in Nevada.[2] *Compare, e.g., Cannon,* 29 F.3d at 476 (officers suspected defendant of narcotics trafficking, but would have made the stop anyway because defendant was driving with a suspended license in violation of California law); *United States v. Lillard,* 929 F.2d 500, 502 (9th Cir.1991) (officer suspected defendant of drug-related activity, but would have pulled defendant over anyway, because defendant was "speeding carelessly in violation of Oregon law"). Nor has the government established that Millan's windshield actually appeared unsafe to the officers.[3] Indeed, the possibility that Roll stopped Millan for safety reasons alone is severely undermined by the magistrate judge's finding that the windshield was "by no means extensively damaged." ER 187.

Moreover, the stop was suggested not by Roll, the trooper, but rather by the city interdiction officer, Larusso. Larusso had no traffic-related duties. The fact that the officer initiating the traffic stop had narcotics interdiction duties but no traffic enforcement duties is an additional factor pointing toward pretext. *Taglavore v. United States,* 291 F.2d 262, 265 (9th Cir.1961) (fact that officer who caused appellant to be arrested for traffic violation was vice squad officer rather than traffic policeman contributed to finding of pretext). Indeed, but for the interdiction program, Larusso would not have been in Roll's car in the first place; Larusso's presence in the car thus supports the conclusion

2. The government's citation to N.R.S. § 484.619 is unconvincing. That section merely states that drivers may not place large posters or decals on their front windshields.

3. Officers may make stops if they observe a safety hazard. *Delaware v. Prouse,* 440 U.S. 648, 660, 99 S.Ct. 1391, 1399–1400, 59 L.Ed.2d 660 (1979). The nature of the questions they may ask, of course, is circumscribed by the purpose of the stop.

that interdiction rather than citing traffic violators was the officers' goal.

To these factors must be added the fact that Roll, unlike most Nevada Highway Patrol officers, had received special training in Nevada's Interdiction Program. Roll testified that in the Interdiction Program, "we're trained to . . . make a traffic stop *to see if the subject is maybe committing a crime.*" ER at 17 (emphasis supplied). The interdiction training received by officers Roll and Larusso thus increases the possibility that they pulled Millan over not for a "minor safety violation," but because of their suspicions about possible contraband.[4]

Considering these facts together, we conclude that reasonable officers in Roll's and Larusso's places would not have stopped Millan because of his windshield, absent a desire to search for evidence of more serious crime. The stop was therefore pretextual under the objective test employed in *Cannon.*

### III.

■■■ The consequence of finding the stop pretextual is that tainted evidence must be excluded. *Wong Sun v. United States,* 371 U.S. 471, 487–88, 83 S.Ct. 407, 417–18, 9 L.Ed.2d 441 (1963). The question we must ask is " 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " *United States v. Foppe,* 993 F.2d 1444, 1449 (9th Cir.) (quoting *Wong Sun,* 371 U.S. at 488, 83 S.Ct. at 417), *cert. denied,* —— U.S. ——, 114 S.Ct. 615, 126 L.Ed.2d 579 (1993). Because the interrogation and search were a direct result of the illegal stop, we hold that all of the evidence must be suppressed. *See, e.g., id.* (confessions and photospread identification excluded as fruit of illegal search); *United States v. Chamberlin,* 644 F.2d 1262, 1267–68 (9th Cir.1980) (testimony regarding defendant's nervous demeanor excluded as fruit of illegal detention), *cert. denied,* 453

U.S. 914, 101 S.Ct. 3148, 69 L.Ed.2d 997 (1981); *United States v. Valdez,* 931 F.2d 1448, 1451–52 (11th Cir.1991) (evidence recovered during consensual search conducted after pretextual stop excluded as fruit of illegal stop).

REVERSED and REMANDED.

CYNTHIA HOLCOMB HALL, Circuit Judge, concurring:

I concur in the panel's conclusion that the stop of Millan's car was pretextual and that, as a result, all evidence obtained as a result of the stop must be suppressed. I write separately, however, because I believe that the majority's discussion of the pretextual stop doctrine, in Part II of its opinion, misstates and misapplies Ninth Circuit law. For this reason, I do not join in Part II of the panel opinion.

The majority's statement that "[o]ur circuit's caselaw has not been entirely consistent in the test it has applied to determine pretext," Majority Opinion at 888, is accurate only up to a point. It is true that some Ninth Circuit cases have in the past been interpreted as mandating a subjective inquiry into police officers' intentions when analyzing a pretextual stop claim, whereas others applied an objective, "reasonable officer" test. Any inconsistency, however, was reconciled by *United States v. Cannon,* 29 F.3d 472 (9th Cir.1994).

*Cannon* surveyed the Ninth Circuit pretextual stop cases, as well as those of other circuits. The opinion noted that "[s]ome of our language has implied that [the] subjective inquiry is required," *id.* at 475, but went on to hold that the prior cases were in fact consistent with the objective test. Specifically, *Cannon* squarely held that when faced with a claim that a traffic stop was pretextual, "courts should inquire whether a reasonable officer 'would have' made the stop anyway, apart from [his or her] suspicions about other more serious criminal activity." *Id.* at 476 (internal quotes in original). This objec-

---

4. Just as the finding of pretext in *Taglavore* was supported by the fact that the stopping officer was a vice squad member rather than a traffic policeman, here the Interdiction Program training undermines the usual presumption that a Highway Patrol officer is concerned primarily with enforcing the traffic laws.

tive test limits our inquiry in the present case.

*Cannon* is the law of the Ninth Circuit on this issue. Unless and until it is overturned by the en banc court, we are bound to apply the objective test that it mandates. I cannot agree, therefore, with the majority's analysis of the present case, which uses both the objective and subjective tests. After *Cannon*, the subjective analysis is simply irrelevant.

I take further issue with the majority opinion's statement of the facts and analysis of those facts in its "objective" section. Majority Opinion at 887–88, 889–90. Officer Roll and Trooper Larusso allegedly pulled Millan over because they noticed that his windshield was cracked. I agree with the majority that driving with a cracked windshield does not appear to be illegal under Nevada law and therefore cannot support the stop. Majority Opinion at 889 & n. 2. Further, the Magistrate Judge found that Millan's windshield was "by no means [so] extensively damaged," ER 187, that a reasonable officer would have considered it a safety hazard and pulled the car over on that basis. This finding is not clearly erroneous. *See United States v. Bowhay*, 992 F.2d 229, 230 (9th Cir.1993). On the basis of these facts alone, I would therefore hold that a reasonable officer would not have stopped Millan, "apart from [his or her] suspicions about other more serious criminal activity." *Cannon*, 29 F.3d at 476.

The majority goes on, however, to discuss the fact that the stop was suggested by Larusso, a city interdiction officer, and that Roll had been trained in the highway drug interdiction program. These additional facts are irrelevant under *Cannon*'s objective test and might suggest that any traffic stop made by an interdiction-trained officer is for that reason alone suspect. In my view, this is a misapplication of the *Cannon* test.

The *Cannon* objective test focuses on the conduct of the suspect and whether a reasonable officer would make a traffic stop when confronted with such conduct. *See, e.g., Cannon*, 29 F.3d at 476 (reasonable officer would stop motorist for driving with a suspended license); *United States v. Lillard*, 929 F.2d

500, 502 (9th Cir.1991) (reasonable officer would stop motorist for "speeding carelessly in violation of Oregon law"). In the present case, the fact that Larusso and Roll may have had interdiction training is not relevant to deciding whether *a reasonable officer* would stop a motorist with a cracked windshield. Moreover, the interdiction program is not an evil or sinister plan by the Nevada Highway Patrol, but an effective and laudable means for Nevada to prevent drug trafficking on its highways. I therefore find that part of the majority's discussion of the objective test to be inappropriate.

For the above reasons, I concur in the judgment and in the panel opinion, with the exception of Part II.